**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Auviene D'ANTIGNAC, a/k/a Jack D'Antignac, Patrick Glen Knight, Thomas Olden Thornton, Timothy David Cahill and Robert Wheeler Welch, Defendants–Appellants.**

**No. 79–5007.**

United States Court of Appeals,
Fifth Circuit.

Oct. 20, 1980.

Andrew A. Taylor, Brunswick, Ga., for D'Antignac.

Fred Dalton Thompson, Nashville, Tenn., James K. Jenkins, Atlanta, Ga., for Knight.

William F. Braziel, Jr., Savannah, Ga., for Thornton and Cahill.

Wilbur C. Smith, III, Fort Myers, Fla., for Welch.

William H. McAbee, II, Kathrine L. Henry, Melissa S. Mundell, Asst. U. S. Attys., Savannah, Ga., for plaintiff–appellee.

Before INGRAHAM, RONEY and THOMAS A. CLARK, Circuit Judges.

ON PETITIONS FOR REHEARING

INGRAHAM, Circuit Judge:

Petitions for rehearing have been filed by all five defendants, and upon reconsideration of our prior slip opinions of May 2, 1980 and August 15, 1980, we vacate both opinions in their entirety and substitute in their place the following, which becomes the opinion of this court.

On July 11, 1978, the five defendants Auviene D'Antignac, Patrick Knight, Thomas Thornton, Timothy Cahill and Robert Welch were indicted on four counts involving approximately 28,310 pounds of marijuana, a Schedule I Controlled Substance. The counts alleged were: 1) importation; 2) possession with intent to distribute; 3) aiding and abetting; and, as is the custom in a scheme of this magnitude, 4) conspiracy to commit the two substantive offenses.[1] The indictment, to which all defendants pleaded not guilty, followed after the seizure and subsequent search of the M/V Little Hornet. After defendants' motion to suppress the marijuana was denied by the district court, the case went to trial and a jury convicted the defendants of all four counts of the indictment. Defendants each perfected an appeal to this court, the primary thrust of which is directed at the district court's denial of the suppression motion. For the reasons set out below, we affirm.

To begin with, this excursion involves another character who was granted immunity from prosecution in exchange for his testimony regarding this joint adventure. The unindicted co-conspirator, Jack Gore, owned several shrimp boats which he docked near Valona, McIntosh County, Georgia, at a dock he had purchased known as the old Kittles' Dock. In the early spring of 1978, Gore was approached by defendant D'Antignac with his potential get–rich–quick scheme.[2] This venture involved the use of Gore's shrimp boats to transport a large shipment of Columbian marijuana from South America to the United States. According to their plans, Gore himself would not be on board the Little Hornet during her journey.

At the time the initial arrangements were being discussed between Gore and D'Antignac, all of Gore's boats, with the possible exception of one old shrimp boat, were in the Gulf of Mexico, apparently fishing. The two met in Fort Myers, Florida, to finalize their plans and to ready the Little Hornet for the trip to South America. It was at this time that Gore first met the other defendants, all of whom allegedly assisted in securing supplies and loading them on the Little Hornet for the trip.[3] Although Gore's ability to recall the initial encounters with the other defendants is somewhat disputed by them, it is clear that Gore did identify them as the ones who were in Fort Myers during the final days of preparation.

All plans having been finalized, the Little Hornet departed for Colombia sometime in the latter part of May 1978. During the time just prior to her departure, and then continuously thereafter, Gore and D'Antignac kept in constant contact with each other using a rudimentary telephone code. According to the plan, Gore's only remaining duty was to be ready to pilot the boat into Kittles' Dock upon her return.

The Little Hornet returned from Colombia, her holds laden with marijuana, and on June 8, she was approximately 20–30 miles seaward of Mayport, Florida. That evening, Gore and several other persons boarded the M/V Miss Shantell and headed out to

1. The original indictment, which did not encompass the importation count, was dismissed on July 12, 1978. The second indictment charged violations of 21 U.S.C. §§ 846, 841(a), 952(a), 963 and 18 U.S.C. § 2.

2. Gore's share in the proceeds of the dope, which was later estimated at a value of $7,000,- ⌒⌒0, was to be $500,000 less expenses.

3. The government introduced into evidence numerous receipts for fuel, supplies, rigging, ice and, in particular, a long range navigational device known as a Loran.

meet the Little Hornet.[4] The rendezvous was at approximately 12 P.M. the next day, June 9, and after some brief discussion between Gore and the three crew members of the Little Hornet, Thornton, Cahill and Knight, both vessels headed back toward Sapelo Sound, just off the Georgia coast.

Once they all reached the Sound, Gore boarded the Little Hornet, as planned, to pilot her through the Intercoastal Waterway to Kittles' Dock. While en route, a smaller boat carrying at least two persons pulled up to her stern and defendant Welch boarded the Little Hornet. Shortly thereafter, around 11 P.M., Gore guided her in to the dock, his task completed.

Defendant D'Antignac now appeared at the dock and all five defendants prepared to unload their cargo. They strung up some lights to assist them. However, when the truck into which the marijuana would be loaded ran into the utility pole and knocked out all the lights and power, the defendants had to alter their plans. D'Antignac phoned Gore and told him the boat would be leaving Kittles' Dock. The Little Hornet thus began her fateful journey back out to the Intercoastal Waterway, her belly still laden with the cargo of marijuana.

On the evening of June 9, around midnight, Customs Patrol Officer Duane Swigert and some county deputies were at Brannen's Dock in Belleville, Georgia, awaiting the return of other officers investigating an unrelated matter. Looking over the area through his binoculars, Officer Swigert noticed a light atop the mast of a vessel out in the Intercoastal Waterway, about four miles away. He watched the movements of the vessel for approximately one hour; the vessel continuously moved north and then south, changing its course between the lighted channel markers several times before finally heading in toward the Valona dock area. These erratic movements, coupled with the late hour, aroused his suspicions. He decided to investigate, so he and his fellow officers drove the five

miles down the road to the Valona dock area, losing sight of the mastlight at several points along the way.

Upon arriving, Officer Swigert and his men turned off their car lights and headed into the dock area. The Little Hornet, with her name clearly appearing on her port and starboard bow, was pulling into the dock. Recalling that he had received a memorandum from his office indicating that Gore's boats, including the Little Hornet, were suspected of being involved in smuggling contraband, and observing the arrival of one of Gore's shrimp boats, coupled with the fact that to his knowledge the coastal waters were closed for shrimping, Officer Swigert's suspicions increased. He therefore decided to investigate further after the boat was docked.

After the Little Hornet was secured to the dock, Officer Swigert approached the vessel, showed his credentials to the occupant and announced he was coming aboard, although he did not have his service revolver drawn. Defendant Cahill immediately stepped back, raised his hands in disbelief and Officer Swigert boarded. He took one step to the doorway of the pilothouse, where he saw defendant Thornton, the other remaining crew member. More importantly, however, he saw a large, partially opened bale right in front of his feet. Through the opening, Officer Swigert had within his plain view a quantity of a green leafy substance. He bent down and took a handful to inspect it and, after smelling it, determined that it was marijuana. He then drew his revolver and arrested Thornton. Cahill was brought in by a deputy and he too was arrested. The officers conducted an on-the-spot search of the cargo hold, which revealed the 28,310 pounds of marijuana.

When the Little Hornet and defendants Cahill and Thornton were secured, Officer Swigert and Deputy Ray Proudfoot left the boat and dock area to summon more police and set up roadblocks. As they pulled

---

4. The M/V Miss Shantell was owned by Leonard Skinner, who, along with his son Richard and daughter Cheryl, accompanied Gore on the run out to the Little Hornet. The Skinners were all granted immunity in exchange for Richard's testimony.

away, a Ford Econoline van carrying defendants D'Antignac, Welch and Knight approached and signaled a left turn into the dock area, which was approximately 100 yards from the roadway. Officer Swigert's suspicions, based on his experience, told him that someone would be arriving to unload the marijuana so he stopped the van right after it completed the turn. He decided to question the three individuals to see if they had come to pick up the marijuana so he asked them to step out of the van. Questioning as to their identity and place of residence ensued but the responses were evasive and uninformative. Deputy Proudfoot identified the driver as defendant D'Antignac. Officer Swigert noticed a gun in a shoulder holster on the suspect later identified as defendant Knight and he therefore instructed deputy Proudfoot to remove it. The third occupant was later identified as defendant Welch. Officer Swigert immediately arrested them for investigation as suspects in connection with the marijuana found on board the Little Hornet.

The five defendants were indicted by the grand jury on four counts arising out of the marijuana importation venture. Gore was named a co-conspirator but was unindicted in exchange for his testimony about the scheme. The defendants moved to suppress the marijuana, alleging an unlawful seizure and subsequent search of the Little Hornet. The motion was denied and the case was tried to a jury. All five defendants were convicted on all counts and each properly perfected his appeal.

On appeal, defendants argue four main points of error, each of which they contend warrants reversal of their convictions.

First, the district court erred in denying defendants' motion to suppress the marijuana. Second, the district court erred in overruling defendants' objection to the testimony of unindicted co-conspirator Gore on the grounds that it was the product of undisclosed promises made to him by the government. Third, the district court erred in failing to require full compliance with defendants' discovery requests pertaining to exculpatory material. Last, the district court erred in denying defendants' motion to dismiss the indictment based upon Sixth Amendment and Jury Selection and Service Act challenges to the grand and petit jury arrays. Finding no reversible error, we affirm the convictions of all five defendants.

The first question to be answered is the constitutionality of the seizure and subsequent search of the Little Hornet.[5] It is clear that customs officers are clothed with the statutory authority to

> go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he may be authorized, within a customs–enforcement area established under sections 1701 and 1703–1711 of this title, or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

19 U.S.C. § 1581(a). Although couched in very broad language, the statute is, of course, circumscribed by the reasonableness requirement of the Fourth Amendment.[6]

---

**5.** Given our resolution of this issue on the merits with respect to defendants Thornton and Cahill, we decline to independently assess the standing, under the standard recently expressed by the Supreme Court in *United States v. Salvucci*, —— U.S. ——, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), of defendants Knight, Welch, and D'Antignac to challenge the seizure and search of the Little Hornet. The government did not challenge their standing at the suppression hearing and none of the parties

has briefed or argued the point before this court.

**6.** The Fourth Amendment to the United States Constitution guarantees that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the

*United States v. Serrano*, 607 F.2d 1145, 1147 (5th Cir.), *cert. denied*, 445 U.S. 965, 100 S.Ct. 1655, 64 L.Ed.2d 241 (1980); *United States v. Freeman*, 579 F.2d 942, 945 (5th Cir. 1978).

The Fifth Circuit in recent years has been inundated with cases presenting Fourth Amendment challenges to boat stops and searches conducted by either Coast Guard or Customs officials. *E. g., United States v. Serrano, supra; United States v. Castro*, 596 F.2d 674 (5th Cir.), *cert. denied*, 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979); *United States v. Whitmire*, 595 F.2d 1303 (5th Cir.), *cert. denied*, —— U.S. ——, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1979); *United States v. Whitaker*, 592 F.2d 826 (5th Cir.), *cert. denied*, 444 U.S. 950, 100 S.Ct. 422, 62 L.Ed.2d 320 (1979); *United States v. Freeman, supra; United States v. Warren*, 578 F.2d 1058 (5th Cir. 1978) (en banc); *United States v. Odom*, 526 F.2d 339 (5th Cir. 1976). Since these cases involve many conflicting variables regarding the vessels' registry, geographical location at the time of the initial sighting, geographical location at the time of the stop, and the standard of suspicion required to validate the stops, the state of the law in this circuit was unclear.

This court, sitting en banc, recently decided the case of *United States v. Williams*, 617 F.2d 1063 (5th Cir. 1980). *Williams* involved the stop and search of a foreign vessel on the high seas[7] pursuant to 14 U.S.C. § 89(a). The court found constitutional the plenary statutory authority of the Coast Guard to *seize* a foreign vessel in international waters if there was reasonable cause to suspect that the vessel was being used to smuggle contraband into the United States. *United States v. Williams, supra*, 617 F.2d at 1075–1084. The court also held

that reasonable suspicion, rather than probable cause, was the appropriate Fourth Amendment standard by which to judge the lawfulness of § 89(a) searches of the private areas of the vessel's holds conducted for the purpose of discovering contraband. *Id.* at 1087–1088. More importantly, although *Williams* did not purport to define the Fourth Amendment standards for customs searches, *see id.* at 1088 n.30 ("[o]ur analysis does not imply that the reasonable suspicion test would also govern a *customs* search of a vessel within the 12–mile limit."), it clearly negated any suggestion that the Fourth Amendment *mandates* a probable cause and/or warrant requirement to customs searches. *Id.* We therefore conclude that whatever *Williams* does to the "muddled state of our precedent," *id.* at 1071, it does not affect the standard established in *United States v. Serrano, supra*, governing customs seizures of vessels on inland waters.

■ We have noted the broad statutory grant of authority in 19 U.S.C. § 1581(a); the constitutionality of the boarding of the Little Hornet turns, however, on one of the following two principles: 1) a border search; or 2) a limited investigatory stop based upon a reasonable suspicion of law violation. *See United States v. Serrano, supra; United States v. Whitmire, supra*. Although the Little Hornet was initially sighted late at night and was a shrimp boat moving about at a time when coastal shrimping was not in season, we do not feel those facts support a finding that she had crossed the three–mile line. Moreover, we are not certain that a mere reasonable suspicion would suffice. *See United States v. Whitmire, supra*, 595 F.2d at 1307–08 & n.2. We therefore examine the second above stated principle.

■ *Serrano* clearly holds that

place to be searched, and the persons or things to be seized.

7. As was observed by the full court in *United States v. Warren*, 578 F.2d 1058, 1064 n.4 (5th Cir. 1978) (en banc), the "12–mile limit includes the territorial sea, which extends to three miles from the coast, and the contiguous zone, which extends from three to 12 miles from the coast." The term high seas refers to the waters "sea-

ward of the territorial sea and thus encompass[ing] the contiguous zone." *Id.* The area of the high seas beyond the 12–mile limit is what the *Williams* court referred to as international waters. *United States v. Williams*, 617 F.2d 1063, 1073 (5th Cir. 1980).

The Little Hornet was seized in inland waters, not on the high seas.

Customs officers may make an investigatory stop of a vessel on inland waters adjacent to the open Gulf of Mexico under 19 U.S.C.A. § 1581(a) on facts which justify a reasonable suspicion of illegal activity. The evidence need not support suspicion of a border crossing, but only of the presence of contraband.

*United States v. Serrano, supra,* 607 F.2d at 1148 (citation omitted). *See United States v. Castro, supra,* 596 F.2d at 676. We feel that *Serrano* controls this case. The facts known to Officer Swigert included the following: He observed the erratic movements of the vessel in the Intercoastal Waterway late at night for approximately one hour; there were no other vessels in the vicinity either before, during or after the sighting and subsequent boarding; he went to investigate and found a shrimp boat bearing the name Little Hornet pulling into the dock; to his knowledge coastal shrimping was out of season; he had received prior information that the Little Hornet was suspected by the United States Customs Service of being involved in smuggling contraband; he had not seen her in the Valona dock area at all during the spring of 1978. Based on the above facts, the district court found that a reasonable suspicion of law violation existed such that Officer Swigert could make an investigatory boarding to ascertain the identity of those aboard. That finding was not error. The boarding of the Little Hornet was therefore reasonable under the Fourth Amendment scrutiny.

■ Immediately upon stepping aboard the Little Hornet, Officer Swigert was at the doorway to the pilothouse. He then had within his plain view, in front of his feet, a partially opened bale of some green leafy substance. He suspected it to be marijuana, so he took a handful from the exposed portion and smelled and examined it. This brief examination confirmed his suspicion that the substance was marijuana and at that point, there was probable cause to search the hold of the Little Hornet for the purpose of discovering contraband. *United States v. Serrano, supra,* 607 F.2d at 1148. Moreover, there clearly existed the exigent circumstances that defendants contend

were absent. The court in *Whitmire,* where the vessel was docked and the crew ashore, noted that "[i]f exigent circumstances be required, they were present as well." *United States v. Whitmire, supra,* 595 F.2d at 1316. The inherent mobility of a vessel and the attendant possibility of flight or disposal of evidence certainly amount to exigent circumstances. *See United States v. Monroy,* 614 F.2d 61, 64 (5th Cir. 1980); *United States v. Cortes,* 588 F.2d 106, 110–11 (5th Cir. 1979); *United States v. Cadena,* 588 F.2d 100, 101–02 (5th Cir. 1979) (on petition for rehearing); *United States v. Freeman, supra,* 579 F.2d at 947–48. Since we have found that the initial boarding and subsequent search of the Little Hornet was statutorily and constitutionally valid, the district court correctly denied the motion to suppress the marijuana as to defendants Thornton and Cahill.

■ Defendants Welch, Knight and D'Antignac also challenge the legality of the stop of the van near the scene of the seizure of the Little Hornet. Having merely existed from the public highway into the long driveway leading to the dock, the defendants claim there was no lawful reason for the stop. They argue that *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), invalidates random stops to check drivers' licenses and auto registration absent articulable facts sufficient to create a reasonable suspicion concerning the driver or the vehicle's registration. *Prouse* has no application in this case. Officer Swigert did not "randomly" stop the defendants' van. He specifically stopped the van solely because it had turned into the driveway area where he had just seized a vessel loaded with marijuana, and he reasonably believed the defendants were arriving at this dock to retrieve the contraband. There were no other people around at that late hour and he merely decided to investigate the newly arrived vehicle prior to his departure to secure back–up support. The minimal intrusion of the brief stop here, occasioned by Officer Swigert's suspicions that these defendants were arriving to retrieve contraband, satisfies the Fourth

Amendment requirement of reasonableness regarding investigatory stops. *See United States v. Brignoni–Ponce*, 422 U.S. 873, 878–81, 95 S.Ct. 2574, 2578–2580, 45 L.Ed.2d 607, 614–616 (1975).

■ After the three occupants got out of the van, they were immediately questioned. D'Antignac, the driver, gave evasive answers as to where he resided and stated that they had come to investigate the lights and commotion. There were absolutely no lights and no commotion whatsoever. After Officer Swigert noticed a gun in a shoulder holster on defendant Knight, he instructed Deputy Proudfoot to remove it as a precautionary measure for the officers' safety. The defendants gave no more satisfactory explanations to the officers' inquiries and at this point, the combination of all the circumstances surrounding the Little Hornet and the van gave Officer Swigert probable cause to arrest them for suspicion of involvement in the Little Hornet incident.

We therefore conclude that the investigatory boarding and search of the Little Hornet, and the investigatory stop and subsequent arrest of the occupants of the van, were lawful; the suppression motion was thus correctly denied as to all defendants.

■ Defendants argue reversible error in the district court's overruling of their objection to the testimony of unindicted co–conspirator Gore, whose testimony the government candidly admitted was critical in securing the convictions. They argue that Gore clearly perjured himself at either the *James* hearing [8] or at the trial itself. They base their attack on the prosecutor's question to Gore implying that Gore would be prosecuted if he perjured himself, coupled with the fact that Gore conferred with the prosecutor over a noon hour recess. Since his testimony had changed somewhat after lunch, they contend that a promise was given and such an undisclosed promise warrants reversal under the reasoning of *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). We disagree.

First, it is not at all clear that Gore perjured himself. His entire line of testimony was by way of recollection and "to the best of my ability." At the *James* hearing, he could not positively identify everyone by sight alone. All of the defendants were identified at trial, however, by sight or voice as having been in Fort Myers, Florida, or on the Little Hornet itself, aiding in the preparation of the boat. The purpose of the noon conference was merely to inform Gore that he could testify regarding a person's identification through means other than sight, and if he could identify any of the defendants by voice, then to so testify. This testimony at trial was simply more positive, not contradictory. Secondly, *Giglio* involved a case where the jury was unaware of *any* promise of immunity. Here the jury knew of the many promises made to Gore; [9] it was merely unaware of one arguably implied promise, if indeed there was one. Moreover, the underlying focus here is credibility. The jury was properly charged on credibility [10] and we do

---

**8.** *See United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). Under *James*, the question of the admissibility of a co–conspirator hearsay statement offered in evidence against the defendant is a decision to be made by the judge. *James* anticipates an independent showing of admissibility by at least a preponderance of the evidence that 1) there existed a conspiracy, 2) the co–conspirator and the defendant against whom the co–conspirator hearsay statement is offered were members of the conspiracy, and 3) the statement was made during the course of and in furtherance of the conspiracy. *Id.* at 582–83.

The trial of this case occurred prior to the effective date of *James*, and the judge conduct-ed a separate hearing outside the presence of the jury.

**9.** The deal included the release of an $11,500,-000 tax lien, return of the Little Hornet, immunity for the Little Hornet smuggling scheme, and immunity for all events arising out of an incident involving another one of Gore's boats, the M/V Stonefield Lady, which the Coast Guard found mysteriously sunken in the Gulfstream around June 26, 1978.

**10.** The jury instruction included the following:

You are the sole judges of the credibility or believability of each witness and the weight to be given to his testimony. In weighing the testimony of a witness, you should consider

not believe that defendants' alleged error was material to the outcome. *See Giglio, supra.* Defendants' argument is without merit.

Defendants argue reversible error in the district court's failure to require full compliance with discovery requests pertaining to exculpatory material. We note that defendants' erroneous insistence on the importance of the M/V Stonefield Lady incident [11] in this case only serves to weaken their claim of reversible error. It is the Little Hornet incident that is at issue here. Analyzing defendants' argument for its content, the underlying substance merely calls into question the credibility of Gore, a point we have already addressed.

In support of their argument, defendants rely on *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Brady's* proposition is that the withholding or suppression by the prosecution of evidence material to guilt or punishment is violative of due process. *Id.* at 87–88, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218–19. *See Giglio v. United States, supra,* 405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 108 (a finding of materiality of the evidence is required under *Brady*). The recent case of *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), provides the standard of materiality of undisclosed evidence. The omitted evidence must create a reasonable doubt of guilt that did not otherwise exist in order to justify a new trial. *Id.* at 112–13, 96 S.Ct. at 2401–02, 49 L.Ed.2d at 354–55. Neither *Giglio* nor *Brady* provides support for defendants since their discovery requests were tailored for impeachment purposes that could be described as cumulative at best. Moreover, the overwhelming evidence of guilt in this case belies any notion that the discovery material might have created a reasonable doubt. *See Agurs, supra.*

■ Assuming, arguendo, that the discovery requests included evidence material to guilt or punishment, we would nevertheless uphold the district court on this matter. The government complied with court orders for production of documents to the extent of over 340 pages in the record. Defendants simply were not satisfied with the quantum of arguably exculpatory material, if any of it truly was exculpatory, and they now contend, with no citation of authority, that this was insufficient. The district court did not err in denying defendants'

his relationship to the Government or the Defendant; his interest, if any, in the outcome of the case; his manner of testifying; his opportunity to observe or acquire knowledge concerning the facts about which he testified; his candor, fairness and intelligence; and the extent to which he has been supported or contradicted by other credible evidence. You may, in short, accept or reject the testimony of any witness in whole or in part.

The testimony of an alleged accomplice, and the testimony of one who provides evidence against a Defendant as an informer for pay or for immunity from punishment or for personal advantage or vindication, must always be examined and weighed by the Jury with greater care and caution than the testimony of ordinary witnesses.

You, the Jury, must decide whether the witness' testimony has been affected by any of those circumstances, or by his interest in the outcome of the case, or by prejudice against the Defendant, or by the benefits that he has received either financially, or as a result of being immunized from prosecution; and, if you determine that the testimony of such a witness was affected by any one or more of those factors, you should keep in mind that such testimony is always to be received with caution and weighed with great care.

You should never convict any Defendant upon the unsupported testimony of such a witness, unless you believe that testimony beyond a reasonable doubt.

A witness may be discredited or impeached by contradictory evidence, or by a showing that he testified falsely concerning a material matter, or by evidence that at some other time a witness has said or done something, or has failed to say or do something, which is inconsistent with the witness' present testimony.

If you believe that any witness has been so impeached then it is your exclusive province to give the testimony of that witness such credibility or weight, if any, as you may think it deserves.

11. *See* note 9 *supra.*

motion to dismiss or, alternatively, in not ordering more discovery.[12]

■ Defendants' last argument is that the district court erred in denying their motion to dismiss the indictment based upon a challenge to the grand and petit jury arrays. This same challenge in the same judicial district was considered and discussed at length in *United States v. Maskeny*, 609 F.2d 183 (5th Cir.), *cert. denied*, — U.S. —, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980). There the court found no constitutional or statutory infirmity with the process of grand and petit jury selection that would have warranted reversal of the convictions. We do not feel there is a legally significant distinction between the two cases and, accordingly, we reject defendants' juror selection challenges under the Sixth Amendment and the Jury Selection and Service Act, 28 U.S.C. §§ 1861–1869 for the same reasons set out in *United States v. Maskeny, supra*, 609 F.2d at 189–94. *See also United States v. Butler*, 611 F.2d 1066, 1069–70 (5th Cir. 1980).

In summary, we reiterate that the case of *United States v. Serrano, supra*, is controlling on the issue of the constitutionality of the seizure and subsequent search of the Little Hornet. Having reconsidered fully the various challenges raised by defendants, we find that the district court did not err in denying the motion to suppress the marijuana. Furthermore, defendants' other arguments are meritless for the reasons above discussed. The convictions are therefore

AFFIRMED.

THOMAS A. CLARK, Circuit Judge, concurring:

I concur that the district court was correct in denying the motion to suppress the seized marijuana.

However, since I get there by a little different route, I wish to express my reasons. The majority opinion holds that the facts are sufficient to support a limited investigatory stop. I think the facts are too thin. At page 433 the opinion states "the constitutionality of the boarding of the Little Hornet turns, however, on one of the following two principles: 1) a border search; or 2) a limited investigatory stop based upon a reasonable suspicion of law violation." I do not think these principles have to be considered disjunctively.

Most people's mental processes are not compartmentalized and judges fall into the category of "most people." Officer Swigert considered the observations attributed to him on pages 434–435 of the opinion, but he also considered that this was a shrimp boat coming into a dock on the Atlantic from points unknown, when coastal shrimping was not in season. While the majority opinion says that this fact alone would not support a border search, with which I agree, I think this fact, when coupled with the facts relied upon by the majority, gave the officers sufficient grounds to board the vessel.

The Supreme Court at its last term decided *United States v. Mendenhall*, — U.S. —, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), in which it approved the combining of a series of totally innocent facts to constitute a drug courier profile. Based upon such a profile, the court sustained an investigatory stop. While the present case does not involve the drug courier profile, it does suggest use of the common admonition that courts "may consider the totality of circumstances" in determining if a given set of facts add to a reasonable conclusion. Facts too narrow to support either an investigatory stop or a border search, when combined can support the stop.

Consequently, it is my view that here it was proper for the officer to consider the nature of the vessel, that it was not the shrimping season, and that a border crossing was certainly possible, and perhaps even probable. Based upon considering these added facts to the facts relied upon by the majority opinion, I have no problem with concurring.

---

12. In its brief, the government states that it has supplied FBI materials to defendants right up to November 28, 1979, as they became availa-

ble. The government contended earlier that some of the matters sought simply did not exist.