**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Bernard Patrick GOLLWITZER and Robert Charles Gollwitzer,**
**Defendants-Appellants.**

No. 81-5713.

United States Court of Appeals,
Eleventh Circuit.

Feb. 14, 1983.

Hy Shapiro, Miami, Fla., for R. Gollwitzer.

Michael Bloom, Coconut Grove, Fla., for B. Gollwitzer.

Bruce Zimet, Asst. U.S. Atty., Miami, Fla., for plaintiff-appellee.

Before JOHNSON and ANDERSON, Circuit Judges, and HUNTER *, District Judge.

JOHNSON, Circuit Judge:

In October 1980, Customs Patrol Officers Hill, McGinty and Jones were patrolling the Intracoastal Waterway near the Lauderdale Marina aboard an unmarked Formula boat when they spotted the LANAYA, a 42-foot Post Sport Fisherman capable of ocean travel. The LANAYA was heading north on the Intracoastal Waterway, approximately one half mile from the entrance to Port Everglades, coming from the ocean and the adjacent port area of Fort Lauderdale. The Customs officers saw two white males, who were dressed in T-shirts, shorts and topsiders, with fishing poles on the boat. They observed that the LANAYA was riding low in the water, that the boat was covered with salt spray up to the flying bridge, that all the cabin windows were curtained and that the cabin doors were closed. The LANAYA had not violated any speed or wake laws. The day before, in a location about one hundred yards away from where the LANAYA was first sighted, CPO Hill had stopped another Sport Fisherman covered by salt spray, with curtains drawn, carrying two white males and 3700 pounds of marijuana.

The officers donned their United States Customs rain jackets, pulled alongside the LANAYA, identified themselves as Customs officers and advised appellants Bernard Patrick Gollwitzer and Robert Charles Gollwitzer to put their vessel into neutral. With a bullhorn, Officer McGinty asked the appellants where they were coming from. The Gollwitzers paused, stared at each other, and then Bernard answered that they had been "outside fishing." When asked who was the owner of the boat, one of the appellants replied, "We don't know." In response to subsequent questions, the appellants answered that they were the only two on board, that they had no weapons, that the ship's papers were in the cabin, and that the cabin was not locked. When the Customs officers announced that they were going to board the vessel the appellants again looked at each other nervously.

On boarding the LANAYA, Officers Hill and Jones detected a strong odor of marijuana. Officer Hill walked up to the cabin door, looked through a six-inch gap between the curtain and the door, and observed numerous bales of approximately 50 to 60 pounds each, wrapped in burlap or clear plastic. Appellants were placed under arrest, and a search of the vessel revealed 3500 pounds of marijuana as well as a night vision device which was found in Bernard Gollwitzer's briefcase.

After a non-jury trial, appellants were convicted of conspiring to import marijuana into the United States, in violation of 21 U.S.C.A. § 963, and of knowingly and intentionally possessing marijuana with intent to distribute, in violation of 21 U.S.C.A. § 841(a)(1) and 18 U.S.C.A. § 2. They appeal the trial court's denial of their motion to suppress evidence. We affirm.

■■■ This Court has held that Customs officers may make "investigatory stops" of vessels on inland waters if they are aware of articulable facts which justify a reasonable suspicion of illegal activity.[1] *United*

---

* Honorable Edwin F. Hunter, Jr., U.S. District Judge for the Western District of Louisiana, sitting by designation.

1. Under 19 U.S.C.A. § 1581(a) a United States Customs officer is authorized at any time to

*States v. Ruano,* 647 F.2d 577, 579 (5th Cir. Unit B 1981); *United States v. Serrano,* 607 F.2d 1145, 1148 (5th Cir.1979), *cert. denied,* 445 U.S. 965, 100 S.Ct. 1655, 64 L.Ed.2d 241 (1980). All the cases in this Circuit[2] considering the reasonableness of investigatory stops on inland waters have involved the stop *and* boarding of vessels. We now consider the separate issue of whether a stop and inquiry *before* a boarding is by itself reasonable, even without reasonable suspicion of illegal activity.

The government argues that the Customs officers in this case did not need reasonable suspicion of illegal activity to pull alongside the LANAYA and ask the questions they asked because, under the analysis used in *United States v. Berry,* 670 F.2d 583 (5th Cir. Unit B 1982) (en banc) (airport search), this brief encounter did not amount to a "seizure." We do not think that *Berry* controls our analysis.[3] Maritime stops and searches must be viewed from a different perspective. *United States v. Ortega,* 644 F.2d 512, 514 (5th Cir. Unit B 1981); *United States v. Williams, supra,* 617 F.2d at 1079–84; *United States v. Freeman,* 579 F.2d 942, 946–47 (5th Cir.1978).

To determine the reasonableness of a stop and inquiry without reasonable suspicion we weigh the defendants' Fourth Amendment interests against the government interest. *Berry, supra,* 670 F.2d at 594; *United States v. Whitmire,* 595 F.2d 1303, 1312–16 (5th Cir.1979). Our first consideration is the reasonable expectation of privacy involved. *Whitmire, supra,* 595 F.2d at 1312. The degree of privacy one may reasonably expect varies according to the vessel one is aboard. *Id.* A houseboat or a small pleasure craft incapable of ocean travel does not ordinarily provoke concern for customs violations, so sailors on board should not normally expect investigations by Customs officers. Their reasonable expectation of privacy is greater than the degree of privacy enjoyed by sailors on board large fishing boats or yachts like the LANAYA, which are capable of ocean travel and, in the area involved, commonly carry illicit cargo. *See id.* A sailor's privacy also depends on the particular area of the vessel which is involved. It is hard to imagine a crew member with a legitimate expectation of privacy on the open deck of a boat which is in full view of all who might pass by. *See id.*

go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he may be authorized, within a customs-enforcement area established under the Anti-Smuggling Act, or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

*Id.* Though phrased in very broad language, this statute is circumscribed by the reasonableness requirement of the Fourth Amendment. *United States v. D'Antignac,* 628 F.2d 428, 432 (5th Cir.1980), *cert. denied,* 450 U.S. 967, 101 S.Ct. 1485, 67 L.Ed.2d 617 (1981).

2. The Eleventh Circuit has adopted the case law of the former Fifth Circuit handed down as of September 30, 1981, as its governing body of precedent, which is binding unless overruled or modified by this Court en banc. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

3. Contrary to the government's position, the initial stop of the LANAYA would be considered a "seizure." The vessel was not free to proceed. *Berry, supra,* 670 F.2d at 597; *United States v. Williams,* 617 F.2d 1063, 1071 n. 1 (5th Cir.1980) (en banc). Under 19 U.S.C.A. § 1581(d) the operator of the LANAYA would have been subject to pursuit and to a substantial fine if he had failed to comply with the Customs officers' direction to stop. The fact that we consider this brief encounter a seizure, however, does not mean that it is proscribed by the Fourth Amendment unless based on reasonable suspicion. *See United States v. Martinez-Fuerte,* 428 U.S. 543, 556, 560–62, 96 S.Ct. 3074, 3082, 3084, 49 L.Ed.2d 1116 (1976) (although checkpoint stop and questioning is a "seizure" it does not require individualized suspicion); *cf. Berry, supra,* 670 F.2d at 598 (seizure in an airport is constitutional only if based on reasonable suspicion). The question we must decide is whether this type of seizure, in light of the surrounding circumstances, was reasonable.

Our next consideration is the degree of intrusion on protected privacy caused by the government action in question—the anxiety produced and the inconvenience occasioned by stopping a vessel and questioning its crew members. *Id.; see Delaware v. Prouse,* 440 U.S. 648, 656–57, 99 S.Ct. 1391, 1397, 59 L.Ed.2d 660 (1979). Seafarers are presumed to know of the many regulations designed to promote their safety and of the broad authority vested in Customs and Coast Guard officers to enforce these regulations. *United States v. Ortega, supra,* 644 F.2d at 514. The potential for provoking fear by randomly stopping vessels capable of ocean travel is therefore less onerous than that in the context of random automobile stops [4] or airport seizures.[5] *See Whitmire, supra,* 595 F.2d at 1313 ("[B]oaters customarily expect the presence of and rely on aid from coast guard or customs vessels when facing the perils of a marine environment. It is quite possible, therefore, that smugglers form the main class of sailors in whom the approach of these officers provokes anxiety."). The hazard and anxiety involved in pulling a moving car to the side of a road do not exist on the waterways when a ship's operator is asked to put the vessel into neutral. The strong psychological coercion involved in an airport seizure does not present itself during a routine Customs stop. And the time required for Customs officers to ask a few standard questions is minimal.[6]

 Finally, we consider the government interest involved and the importance of these initial stops in promoting that interest. *See Delaware v. Prouse, supra,* 440 U.S. at 658–59, 99 S.Ct. at 1398; *Whitmire, supra,* 595 F.2d at 1314–15. The government, of course, has a strong interest in regulating commerce with foreign nations. In order to carry out their revenue and regulatory duties Customs officers may have to determine whether boats have come from across the border and whether they carry hidden dutiable goods. Moreover, the government has a very strong interest in controlling drug smuggling. *Berry, supra,* 670 F.2d at 594–95; *United States v. Williams, supra,* 617 F.2d at 1087. The problem of preventing drug smuggling is made more difficult by the enormous length of the coastline, the sophistication of smugglers' techniques, and the difficulty of distinguishing smugglers' vessels from the vast assortment of recreational and other vessels not engaged in illicit activities. *Williams, supra,* 617 F.2d at 1087. Clever smugglers go to great lengths to disguise the nature of their voyage, leaving Customs officers with a legal dilemma. It is sometimes impossible for Customs officers to detect the presence of contraband in a vessel without going aboard, yet they may not board a vessel on inland waters unless they have a reasonable suspicion of illegal activity. *United States v. Villamonte-Marquez,* 652 F.2d 481, 488 (5th Cir.1981), *cert. granted,* 457 U.S. 1104, 102 S.Ct. 2902, 73 L.Ed.2d 1312 (1982). Initial stops provide some relief from this dilemma. Pulling alongside a vessel and asking a few questions about the vessel's port of origin, ownership, and documentation is far less intrusive than stopping the vessel and immediately boarding it. And in some cases the crew's unsatisfactory responses to the questions asked may provide a basis for the reasonable suspicion necessary to board. *See United States v. Kent,* 691 F.2d 1376, 1381 n. 9 (11th Cir.1982). If we were to

---

**4.** Cf. *Delaware v. Prouse, supra,* 440 U.S. at 657, 99 S.Ct. at 1398 ("signaling a moving automobile to pull over to the side of the roadway, by means of a possibly unsettling show of authority ... may create substantial anxiety.").

**5.** Cf. *Berry, supra,* 670 F.2d at 598 (Asking individuals to come to a police office in an airport involves "substantial psychological coercion from the intimation that there is strong suspicion that an individual is involved in a criminal act.")

**6.** A different situation would be presented if the questioning is extensive or coercive. The questions asked in this case should serve as a model for these initial stops. The crew was asked where they were coming from, who owned the boat, how many were on board, if they had weapons, if they had documentation, and whether the documents were accessible.

conclude that these initial stops are unreasonable, Customs would be left with no effective alternative on the Intracoastal Waterway, which in the past few years has proved to be infested with drug smugglers.

In assessing the competing interests, we note that the LANAYA was capable of ocean travel and that the only invasion of privacy consisted of a visual inspection by Customs officers from aboard their own boat and their asking a few questions.[7] This intrusion is minimal when compared to the government interest involved. We therefore hold that under the facts of this case the initial stop and inquiry by Customs officers on inland waters was within their statutory authority[8] and was reasonable within the meaning of the Fourth Amendment.

After the Customs officers pulled alongside the LANAYA, asked the crew members questions and received responses from the Gollwitzers, they had reasonable suspicion of illegal activity and their boarding was justified. In addition to the responses to the questions, the officers knew there was salt spray on the boat, its curtains and cabin doors were closed, it appeared to be riding low in the water, and the previous day a similar vessel carrying marijuana was stopped in the same location. Most important though, in response to a question asked during the initial stop, defendants replied that they did not know who owned the LANAYA. This by itself would provide reasonable suspicion of illegal activity.

Upon boarding the LANAYA the Customs officers smelled the marijuana, giving them probable cause to search the vessel without a warrant. *United States v. Lueck,* 678 F.2d 895, 903 (11th Cir.1982); *United States v. Villamonte-Marquez, supra,* 652 F.2d at 486. Once the Customs

agents had probable cause to search the vessel, that probable cause supported a search of every part of the vessel that might contain the object of the search, including containers or briefcases. *See United States v. Ross,* 456 U.S. 798, 817–824, 102 S.Ct. 2157, 2169–2172, 72 L.Ed.2d 572 (1982).[9]

AFFIRMED.

---

**7.** If the vessel stopped were a houseboat or a small pleasure craft incapable of crossing the border, or if the questioning were extensive or coercive, we would require reasonable suspicion of illegal activity to justify the stop.

**8.** 19 U.S.C.A. § 1581(a), *supra* n. 1.

**9.** Our conclusion that the Customs agents had probable cause to search the vessel makes it unnecessary to consider the government's argument that the defendants, because they had in fact crossed the border, did not have any reasonable expectation of privacy.