CAMPBELL, Acting Chief Judge.
Appellant, Livingston K. Saunders, challenges the trial court’s denial of his motion to suppress. After the denial, appellant pleaded no contest to the charge of operating a vessel on the waters of the state while under the influence (section 327.35, Florida Statutes (1997)), and reserved his right to appeal the denial of his dispositive motion to suppress. We affirm.
On October 2, 1998, Petty Officer Battle of the United States Coast Guard, together with a marine unit of the Fort Myers Police Department, was patrolling the waters of the Caloosahatchee River in the vicinity of the Edison Bridge in Fort Myers. Appellant conceded at oral argument that the United States has jurisdiction over those waters. Petty Officer Battle, operating a twenty-one-foot Coast Guard vessel, was in the process of randomly boarding vessels on the Caloosa-hatchee River to insure compliance with federal laws and regulations when, at approximately 9:20 p.m., he stopped and boarded a twenty-one-foot Mako open fisherman pleasure craft occupied and operated solely by appellant.
During the time that Petty Officer Battle was on board appellant’s vessel conducting his inspection, he was accompanied by a Fort Myers police officer. Petty Officer Battle described his activities as a “4100 Administrative Boarding,” which he explained as follows: “4100 is a form that the Coast Guard uses to conduct basically an administrative boarding to check and make sure that the vessel is in compliance with all federal and applicable laws.”
As a result of the “4100 Inspection,” appellant was cited for three violations for failure to have required personal flotation devices on board his vessel. Appellant also appeared to be under the influence of intoxicants. Prior to stopping appellant and boarding his vessel, Petty Officer Battle had seen appellant leaving Shooters, a local drinking establishment. After observing appellant’s apparently intoxicated condition on board his vessel, Petty Officer Battle conducted various field sobriety tests and determined that appellant was unable to safely operate his vessel. Consequently, Petty Officer Battle turned appellant over to the Fort Myers police officer, who arrested appellant for the offense for which he was ultimately convicted.
Even though appellant argues that Coast Guard Petty Officer Battle had no plenary authority to stop and board his vessel unless the vessel was in international waters or was capable of venturing into international waters, he conceded at oral argument that the United States has jurisdiction over the waters at issue here. He argues, therefore, that Petty Officer Battle, under the circumstances in this case, had no authority to board his vessel in the absence of a reasonable suspicion of unlawful activity. In support of his position, appellant relies on United States v. Gollwitzer, 697 F.2d 1357 (11th Cir.1983), Blair v. United States, 665 F.2d 500 (4th Cir.1981), United States v. Williams, 544 F.2d 807 (5th Cir.1977), and Chi v. State, 421 So.2d 670 (Fla. 3d DCA 1982).
The fallacy of appellant’s argument is that all of the cases he relies upon interpreted the rights of customs officers (and Coast Guard officers acting as agents of the U.S. Customs Service) in enforcing the customs laws of the United States and were decided prior to the Supreme Court’s decision in United States v. Villamonte-Marquez, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983). In Villamonte-Mar-quez, the Supreme Court made a clear distinction between a boarding that is initiated as a document check and a boarding by customs or Coast Guard officers that is *726 initiated for other reasons. A boarding that is initiated as a document check for the purpose of ensuring compliance with customs and maritime laws and regulations does not require the officer to possess a reasonable suspicion of unlawful activity while a boarding that is initiated for other reasons requires that the boarding officer possess a reasonable suspicion of unlawful activity. Specifically, Villa-monte-Marquez held that customs officers could board vessels under the customs statute, 19 U.S.C. § 1581, to perform the functions authorized by that statute without a reasonable suspicion of unlawful activity. Customs officers’ authority is provided in 19 U.S.C. § 1581 as follows:
§ 1581. Boarding vessels
(a)Customs officers
Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he may be authorized, within a customs-enforcement area established under the Anti-Smuggling Act [19 U.S.C.A. 1701 et seq.], or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.
Similarly, the scope of a Coast Guard officer’s authority to board a vessel in waters over which the United States has jurisdiction in order to carry out inspections mandated by law is contained in 14 U.S.C. § 89, which provides:
§ 89. Law enforcement
(a) The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas . and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship’s documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized.
(b) The officers of the Coast Guard insofar as they are engaged, pursuant to the authority contained in this section, in enforcing any law of the United States shall:
(1) be deemed to be acting as agents of the particular executive department or independent establishment charged with the administration of the particular law; and
(2) be subject to all the rules and regulations promulgated by such department or independent establishment with respect to the enforcement of that law.
(c) The provisions of this section are in addition.to any powers conferred by law upon such officers, and not in limitation of any powers conferred by law upon such officers, or any other officers of the United States.
*727 The primary issue in enforcing these enactments is whether the actions authorized by statutes such as 14 U.S.C. § 89 and 19 U.S.C. § 1581 are overly intrusive of Fourth Amendment rights. The Supreme Court in Villamowte-Marquez holds that they are not. Perhaps Justice Brennan in his dissent capsules the holding of the court best when he states:
The Court today holds ... that police on a roving, random patrol may stop and board any vessel, at any time, on any navigable waters accessible to the open sea, with no probable cause or reasonable suspicion to believe that there has been a crime or a border crossing, and without any limits whatever on their discretion to impose this invasion of privacy.
In Villamonte-Marquez, customs officers, accompanied by Louisiana State policemen, were patrolling the Calcasieu River Ship Channel, some eighteen miles inland from the Gulf coast when they sighted a forty-foot sailboat anchored on the west side of the channel. A customs officer and an officer of the Louisiana State Police, admittedly without a reasonable suspicion of unlawful activity, boarded the vessel and asked to see the vessel’s documents. While examining the documents offered for examination, the customs officers smelled burning marijuana and, looking through an open hatch, observed what subsequently proved to be 5800 pounds of baled marijuana. The two individuals on the sailboat were arrested and subsequently convicted in United States District Court of conspiracy to import marijuana. The Fifth Circuit Court of Appeals reversed the convictions, finding that the boarding of the sailboat was not reasonable under the Fourth Amendment in the absence of a reasonable suspicion of a law violation. The Supreme Court granted certiorari because of a conflict among the circuits and because of “the importance of the question ... as it affects the enforcement of Customs laws.” M at 584, 103 S.Ct. 2573.
The Supreme Court reversed the holding of the Fifth Circuit and held that the boarding of the sailboat, even in the absence of a reasonable suspicion of unlawful activity, was a proper exercise of authority granted customs officers under the authority of 19 U.S.C. § 1581(a), and did not constitute an unreasonable encroachment on the parties’ Fourth Amendment rights. The Supreme Court explained its holding in part as follows:
Our focus in this area of Fourth Amendment law has been on the question of the ‘reasonableness’ of the type of governmental intrusion involved. ‘Thus, the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual’s Fourth Amendment interests against its promotion of legitimate governmental interests.’ It seems clear that if the customs officers in this case had stopped an automobile on a public highway near the border, rather than a vessel in a ship channel, the stop would have run afoul of the Fourth Amendment because of the absence of articulable suspicion. But under the overarching principle of ‘reasonableness’ embodied in the Fourth Amendment, we think that the important factual differences between vessels located in waters offering ready access to the open sea and automobiles on principal thoroughfares in the border area are sufficient to require a different result here.
‡ ‡ H:
Quite apart from the aforementioned differences between waterborne vessels and automobiles traveling on highways, the documentation requirements with respect to vessels are significantly different from the system of vehicle licensing that prevails generally throughout the United States.
* * * *
The panoply of statutes and regulations governing maritime documentation are *728 likewise more extensive and more complex than the typical state requirements for vehicle licensing; only some of the papers required need explicit mention here to illustrate the point.
[[Image here]]
Many of these vessels must also submit to periodic inspection by the Coast Guard and a ‘certificate of inspection’ must be kept on the vessel at all times. Smaller American vessels cannot be issued federal documentation papers, but under federal law each such vessel with propulsion machinery must have a state-issued number displayed on a ‘certificate of number’ that must be available for inspection at all times. Vessels not required to carry federal documentation papers also may be required to carry a state-issued safety certificate.
[[Image here]]
These documentation laws serve the public interest in many obvious ways and respondents do not suggest that the public interest is less than substantially furthered by enforcement of these laws. They are the linchpin for regulation of participation in certain trades, such as fishing, salvaging, towing, and dredging, as well as areas in which trade is sanctioned, and for enforcement of various environmental laws.
[[Image here]]
Requests to check certificates of inspection play an obvious role in ensuring safety on American waterways. While inspection of a vessel’s documents might not always conclusively establish compliance with United States shipping laws, more often than not it will.
While the need to make document checks is great, the resultant intrusion on Fourth Amendment interests is quite limited. While it does intrude on one’s ability to make ‘free passage without interruption,' it involves only a brief detention where officials come on board, visit public areas of the vessel, and inspect documents. ‘Neither the [vessel] nor its occupants are searched, and visual inspection of the [vessel] is limited to what can be seen without a search.’ Any interference with interests protected by the Fourth Amendment is, of course, intrusive to some degree. But in this case, the interference created only a modest intrusion.
[Citations omitted].
Villamonte-Marquez has, at least for now, settled the issue that the Fourth Amendment is not violated by the suspi-cionless boarding of vessels by customs officers to make document checks. Similarly, suspicionless pure Coast Guard boardings of vessels for the purpose of inspections for compliance with boating safety laws, and otherwise, has long been a practice accepted as being not unreasonably intrusive of boaters’ Fourth Amendment rights. United States v. Guillen-Linares, 643 F.2d 1054 (5th Cir.1981), decided prior to Villamonte-Marquez, lends validity to that observation.
In Guillen-Linares, a suspicionless Coast Guard boarding, accomplished at the request of the U.S. Customs Service, was held to be a customs boarding which was interpreted at that time to require the presence of a reasonable suspicion of unlawful activity in order to be valid. The vessel in Guillen-Linares (the Miss Port Canaveral) was anchored two miles outside the nearest shipping lane in the inland waters of Tampa Bay. The United States District judge denied a defense motion to suppress the evidence, regardless of the suspicionless boarding, holding that the boarding was valid under the generally recognized authority of the Coast Guard specified in 14 U.S.C. § 89(a). The Fifth Circuit, in analyzing the appellant’s contentions, clearly recognized differing approaches to the legality of a boarding depending on whether the boarding was a “pure” Coast Guard boarding pursuant to 14 U.S.C. § 89(a), or a U.S. Customs *729 boarding authorized under 19 U.S.C. § 1581(a) and accomplished by the Coast Guard at Customs’ request pursuant to 14 U.S.C. § 89(b). The Fifth Circuit had remanded the case to the District Court for a factual determination of which type boarding was at issue. The results of that remand are succinctly stated in the Guil-len-Linares opinion as follows:
Appellants have contended consistently that the boarding in question should be viewed, pursuant to 14 U.S.C. § 89(b) (1976), as one accomplished by Customs through the agency of the Coast Guard, and that its legality should therefore be measured by reference to 19 U.S.C. § 1581(a) (1976), the Customs Service boarding authorization statute. Because of the potential for differing approaches to the legality of this boarding, we remanded the case to the district court for a finding of whether the Coast Guard boarded as Coast Guardsmen or as officers of the Customs. The district court has found ‘that the individuals in the boarding party acted under the direction of the Customs Service and, in the circumstances of this case, were acting in the capacity of Customs agents rather than Coast Guardsmen.’ Order of January 28,1981. The case, is therefore, in a posture suitable for resolutions.
The district court has found that it was, in effect, the Customs Service that boarded the Miss Port Canaveral. Accordingly, we must judge the legality of that boarding pursuant to the constitutional standards this circuit has engraft-ed onto the broad authorization of section 1581(a).
In United States v. Serrano, 607 F.2d 1145, 1148 (5th Cir.1979), cert. denied, 445 U.S. 965, 100 S.Ct. 1655, 64 L.Ed.2d 241 (1980), we held that ‘Customs officers may make an investigatory stop of a vessel on inland waters adjacent to the open Gulf of Mexico under 19 U.S.C.A. § 1581(a) on facts which justify a reasonable suspicion of illegal activity.’ See also United States v. Williams, 617 F.2d 1063, 1072 n. 3 (5th Cir.1980) (en banc). In United States v. D’Antignac, 628 F.2d 428 (5th Cir.1980), cert. denied, 450 U.S. 967, 101 S.Ct. 1455, 67 L.Ed.2d 617 (1981), we formulated this holding into a test, ruling that the constitutionality of a section 1581(a) boarding in inland waters turns ‘on one of the following two principles: (1) a border search; or (2) a limited investigatory stop based upon a reasonable suspicion of law violation.’ Id. at 433. See United States v. Brignoni-Ponce, 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975); United States v. Whitaker, 592 F.2d 826, 829 (5th Cir.), cert. denied, 444 U.S. 950, 100 S.Ct. 422, 62 L.Ed.2d 320 (1979). See also United States v. Stanley, 545 F.2d 661 (9th Cir.1976), cert. denied, 436 U.S. 917, 98 S.Ct. 2261, 56 L.Ed.2d 757 (1978).
It is clear from the record before us that the boarding of the Miss Port Canaveral did not constitute a border search. Thus, the issue is whether, absent any articulated facts or circumstances which might have aroused in the customs officers a reasonable suspicion of illicit activity, the seizure of the Miss Port Canaveral was reasonable under the fourth amendment. We find that it was not, and therefore we must reverse the district court’s denial of appellants’ motion to suppress. [Footnotes omitted].
The concurring opinion of Judge Coleman in Guillenr-Linares gives further credence to our conclusory observations that even prior to Villamonte-Marquez, suspi-cionless pure Coast Guard boardings under 14 U.S.C. § 89(a) were looked upon in a Fourth Amendment context far more favorably than suspicionless Customs boardings either with or without Coast Guard assistance, pursuant to 19 U.S.C. § 1581(a). See also United States v. Iglesias-Uranga, 721 F.2d 1512 (11th Cir.1984); United States v. Ceballos, 706 F.2d 1198 (11th Cir.1983). Judge Coleman, concurring specially in Guillenr-Linares, *730 writes interestingly and prophetically regarding the boarding of the shrimping vessel, Miss Port Canaveral, as follows:
Under the terms of Section 89(a) the Coast Guard is statutorily empowered to board any vessel lying in United States waters to inspect documentation. Such a boarding is not a traditional search or seizure. Furthermore, there could hardly be much expectation of privacy in what is left in plain view of sight or senses before such a boarding takes place.
[[Image here]]
Canaveral had no documents. The marijuana was in plain view of one looking for the registration number, a procedure which everyone knows is sure to follow the absence of documents. If I were deciding on my own, I would hold that as to the Canaveral there was no transgression of the Fourth Amendment. With or without a request, the Coast Guard could board and inspect. Anything thereafter found in plain view was not a search.
i}{ $ íjí íjí
If a judge of an inferior court may be so presumptuous as to say so, I think the Supreme Court should be given an opportunity to clarify this clouded field. What does the Fourth Amendment really require in cases like this one?
The Supreme Court in Villamonte-Mar-quez, shortly after the decision in Guillem-Linares, accepted jurisdiction to decide the very issue raised by Judge Coleman. The holding in Villamonte-Marquez followed Judge Coleman’s suggested conclusions and surely brought a smile to the face of that “presumptuous judge of an inferior court.”
In view of the above analysis, we conclude that the boarding here may be characterized as a “pure” Coast Guard boarding under 14 U.S.C. § 89(a), and that Petty Officer Battle was authorized to board appellant’s vessel in waters over which the United States has jurisdiction even in the absence of a reasonable suspicion of unlawful activity. Petty Officer Battle boarded the vessel to perform a “4100 inspection,” which is, essentially, a document check. The Fort Myers police unit did not direct the investigation, nor for that matter, did the Fort Myers police unit take any active part in the investigation except to take custody of appellant once he was arrested. The fact that a Fort Myers police officer also boarded appellant’s vessel does not change the essential character of the boarding. See United States v. Ceballos, 706 F.2d at 1200-01. Although Ceballos talks in terms of other federal officers who accompany the boarding, we can discern no meaningful distinction, for our purposes here, between the presence of a federal employee and a municipal police officer at such a boarding. Having found that Petty Officer Battle had the authority to stop appellant’s vessel in the absence of a reasonable suspicion of unlawful activity for purposes of conducting a document check, we conclude that appellant’s motion to suppress Battle’s subsequent discovery of appellant’s intoxication was properly denied.
Affirmed.
BLUE and DAVIS, JJ, Concur.