UNITED STATES of America,
Plaintiff-Appellee,

v.

Venerando German SERRANO, Pedro Ricardo Gutierrez, Jesus Hernandez, Juan Raymond Herrera and Raul Hernandez, Defendants-Appellants.

No. 78–5600.

United States Court of Appeals, Fifth Circuit.

Dec. 7, 1979.

Rehearing and Rehearing En Banc Denied Feb. 4, 1980.

Douglas J. Titus, Jr., Asst. U.S. Atty., Tampa, Fla., for plaintiff-appellee.

Joseph Ficarrotta, Tampa, Fla., for J. Hernandez.

Anthony F. Gonzalez, Tampa, Fla., for Herrera and Hernandez.

Richard A. Lazzara, Tampa, Fla., for Herrera.

Bennie Lazzara, Jr., Tampa, Fla., for Gutierrez and R. Hernandez.

William R. Tunkey, Weiner, Robbins & Tunkey, P. A., Jeffrey S. Weiner, Miami, Fla., for Serrano.

Before WISDOM, AINSWORTH and RONEY, Circuit Judges.

RONEY, Circuit Judge:

Five defendants apprehended in Tampa Bay, Florida, on a boat carrying 50,000 pounds of marijuana appeal convictions for conspiracy to possess with intent to distribute and possession with intent to distribute marijuana. 21 U.S.C.A. §§ 841(a)(1), 846.

They challenge three aspects of their trial: denial of their motion to suppress evidence obtained on an alleged illegal search of the boat; denial of their motion for disqualification of the trial judge because of certain statements he had made previously about narcotics cases; and references by the Government in the course of its case-in-chief and rebuttal closing argument to defendants' silence at the time of arrest. We affirm.

During a routine patrol of Tampa Bay around midnight on June 8, 1978, Customs officers spotted a shrimping vessel approximately sixty-five feet in length traveling up the shipping channel towards Tampa without required red and green navigational lights on the bow or white light on the stern. The Customs boat pulled off to the side of the channel and then followed the vessel at a distance of a half-mile to a mile. Officers utilized night vision devices to assist surveillance. The shrimping vessel left the channel and proceeded into shallow waters as it neared Apollo Beach, a residential area with a public launching facility and marina. Its range and deck lights were extinguished, and it went dead in the water. Lights were flashed between the shrimper and a smaller vessel and the two vessels approached or closed with each other. Approximately forty-five minutes later, the shrimper returned to the shipping channel without lights. In the channel all required lights, including navigational lights, were turned on. As the vessel headed down the bay towards the open waters of the Gulf of Mexico, several small boats were sighted in her immediate vicinity. Customs officers identified the vessel as the BONNIE LASS, identified themselves and boarded the vessel. A Customs officer was handed the ship's documents and questioned one of five men aboard as to whether he was the captain or the owner or master named in the documents and whether the vessel was carrying any cargo, shrimp or fish. During the conversation the officer smelled marijuana. The search which followed revealed 1,312 bales of marijuana on board.

## I. *Denial of Motion to Suppress Evidence*

Defendants argue an unconstitutional search of the BONNIE LASS. The case was presented to the district court, and argued before this Court on appeal, as if probable cause was required in order for the boarding of the vessel to be legal. The district court found probable cause to be a close question, but held that probable cause existed for the boarding.

Based on recent decisions by this Court, we conclude that only reasonable suspicion of illegal activity was necessary to justify the boarding. The evidence clearly meets this standard, even though the evidence might also support the denial of the motion to suppress based on the probable cause standard.

Customs officers are authorized by 19 U.S.C.A. § 1581(a) to

go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he may be authorized, within a customs-enforcement area established under sections 1701 and 1703–1711 of this title, or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

Searches and seizures made pursuant to the statute must, of course, meet the general standard of reasonableness imposed by the Fourth Amendment. *United States v. Freeman*, 579 F.2d 942, 945 (5th Cir. 1978).

This Court has considered several Fourth Amendment attacks on Customs boardings or searches conducted in inland or internal

waters, the ports, harbors, bays, river mouths and adjacent parts of the sea inside the coastline. The cases have indicated that these bodies of water adjacent to the sea are not part of "customs waters" but have not decided whether random Customs boarding and document checks would be constitutionally permissible in these waters. *See United States v. Whitmire*, 595 F.2d 1303, 1315–1316 (5th Cir. 1979), *petition for cert. filed*, 48 U.S.L.W. 3262 (Sept. 5, 1979, No. 79–375); *United States v. Castro*, 596 F.2d 674, 676 (5th Cir. 1979), *petition for cert. denied* —— U.S. ——, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979).

Customs boardings have been approved in inland waters where Customs officials had reasonable suspicion of a Customs violation. In *United States v. Whitmire, supra,* the Court assessed the constitutionality of a boarding of a boat initially sighted traveling in the intracoastal waterway but boarded only after it had reached the dock and its occupants had gone ashore. The Court held the boarding constitutional where the officers had reasonable suspicion of a Customs violation, and the boarding followed an unsatisfactory document check on shore. 595 F.2d at 1316. The Court noted that but for the fact that the boat had reached shore and defendants had disembarked, the boarding would have been justified as an "investigatory stop" under *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *United States v. Whitmire*, 595 F.2d at 1308.

A search of a vessel moored in a marina four miles from the Gulf of Mexico was declared unconstitutional in *United States v. Williams*, 544 F.2d 807 (5th Cir. 1977). The Court concluded that at the time of boarding the "probably unseaworthy private craft," Customs officers had

> no knowledge of articulable facts which, taken together with logical inferences from those facts, would cause them reasonably to believe that this vessel fell into customs' area of concern, or that a viola-

tion of the law was being committed on board.

544 F.2d at 811.

The Supreme Court, considering entry of illegal aliens by automobile, concluded in *Brignoni-Ponce* that Border Patrol Officers conducting roving patrols in the border area could stop vehicles where they are aware of "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the stopped vehicle contains illegal aliens. 422 U.S. at 884, 95 S.Ct. at 2582.

Most recently, this Court considered an inland waters Customs boarding under conditions very similar to those before us. The boarding in *United States v. Castro, supra,* occurred after Customs observed the boat in the intracoastal waterway heading towards open waters 20 miles away. The boarding, which occurred before the boat reached the coastline, was held constitutional based on "sufficient articulable facts to support an inference" that the vessel was involved in smuggling contraband.

■ We therefore conclude that Customs officers may make an investigatory stop of a vessel on inland waters adjacent to the open Gulf of Mexico under 19 U.S.C.A. § 1581(a) on facts which justify a reasonable suspicion of illegal activity. The evidence need not support suspicion of a border crossing, but only of the presence of contraband. *See United States v. Rivera*, 595 F.2d 1095, 1098 n.4 (5th Cir. 1979).

We are concerned here only with the officers' justification for stopping and boarding the vessel. Defendants do not contest the existence of probable cause to search the vessel once officers had boarded and smelled marijuana. *See United States v. Freeman*, 579 F.2d 942, 948 (5th Cir. 1978).

*Brignoni-Ponce* includes as factors to be considered in assessing reasonable suspicion,

proximity to the border, usual traffic patterns in the area, recent illegal traffic, the driver's behavior and aspects of the vehicle's appearance. 422 U.S. at 884–885, 95 S.Ct. 2574.

■ The BONNIE LASS was in inland waters adjacent to the open seas throughout her Customs surveillance and at the time of boarding. The Customs officers who boarded the BONNIE LASS had observed the boat traveling at midnight up the main shipping channel without navigation lights. They saw the boat turn out of the channel, extinguish all lights and proceed into a shallow area near a residential area not normally frequented by shrimping vessels. The BONNIE LASS was observed to rendezvous with another darkened vessel after an exchange of lights. One of the officers testified that in five years of patrolling Tampa Bay he had seen only one other vessel of this kind leave the channel and behave in a similar manner. During the course of this night's patrol the officers saw no vessels at all other than the ones involved in these incidents. When the vessel was stopped, though apparently still five or six miles from the "border" three miles offshore, it was nearing the mouth of the bay and was apparently going out into the Gulf of Mexico. These observations and the rational inferences they engender reasonably warranted the Customs officers' suspicion that the BONNIE LASS was engaged in illegal smuggling activities. The stop and boarding therefore withstand defendants' constitutional challenge.

## II. *Trial Judge's Refusal to Recuse Himself*

Defendants contend the trial judge committed prejudicial and reversible error in denying their motions to disqualify the trial judge, predicated on 28 U.S.C.A. §§ 144, 455. The affidavits accompanying defendants' motions claimed Judge Hodges had a personal bias and prejudice against defendants as members of a class of persons charged with large-scale marijuana offenses. In support of this claim, defendants recited remarks made by Judge Hodges in sentencing proceedings in a similar case several months before. Judge Hodges had stated:

Frankly, I wonder whether the term of imprisonment now provided in these plea agreements is sufficient to serve any useful purpose as a general deterrent, given the experience that this Court has had not only recently, but contemporaneously, with the ongoing importation of contraband from Colombia into this Country, and especially this District.

And I declared from this Bench as recently as yesterday in a case being tried, and in just these words, that I am sick and tired of it.

I'm going to accept the plea agreement in this case, but I give warning now to the United States Attorney's office and to the public, and without in any way abdicating my judicial discretion and reviewing each case on a case-by-case basis, that I intend to deal as sternly as the law will permit in the future with anybody who is convicted in this court before me of the offense of importing contraband from anyplace outside the United States into the United States, and I intend to apply that approach in an evenheaded fashion regardless of the nationality of the defendants.

Referring to the large number of Colombian citizens indicted for similar offenses, Judge Hodges continued:

Perhaps the attitude I have expressed is an inflexible one. But the only tool that the law has given me to combat this obvious flow of . . . contraband from the Republic of Colombia to the United States is to put those who bring it here in prison. And I frankly declare that's what I intend to do, if I have to put the entire population of that Country in an American penitentiary.

■ Once a party files a timely and sufficient affidavit that the trial judge is personally prejudiced against him, 28 U.S.C.A. § 144 demands the trial judge's recusal. While the trial judge may not pass upon the truthfulness of the affidavit's allegations, he must determine whether the facts set out in the affidavit are legally sufficient to require recusal. *Davis v. Board of School Commissioners*, 517 F.2d 1044, 1051 (5th Cir. 1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976). The formula for legal sufficiency adopted by this Court requires defendant to show:

1. The facts are material and stated with particularity.

2. The facts are such that, if true they would convince a reasonable person that a bias exists.

3. The facts show the bias is personal, as opposed to judicial, in nature.

*Parrish v. Board of Commissioners of Alabama State Bar*, 524 F.2d 98, 100 (5th Cir. 1975) (*en banc*), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976).

■ We conclude that Judge Hodges properly denied the motions to disqualify because the alleged bias was judicial rather than personal and because the facts in the affidavit would not have convinced a reasonable person of the existence of personal bias against the defendants.

■ To be disqualifying, the alleged bias of prejudice must stem from an extrajudicial source. *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Davis v. Board of School Commissioners*, 517 F.2d at 1051 (origin of alleged bias was language in order then before the court and an opinion in a previous case). *See, e. g., Berger v. United States*, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921) (prejudice against German-Americans). Reading Judge Hodges' remarks in context clearly demonstrates that any predisposi-

tion to sentence volume drug offenders severely stemmed from his observations in a strictly judicial capacity as to the volume of such cases in the courts and the lack of deterrent effect of light sentences for such offenders. *See also United States v. Johnson*, 537 F.2d 1170, 1175 (4th Cir. 1976) (district judge's announced belief heroin distribution deserved severe punishment did not disqualify him from conducting retrial); *Baskin v. Brown*, 174 F.2d 391, 394 (4th Cir. 1949) (in racial discrimination suit affidavits showed, at most, judge's zeal for upholding blacks' rights and indignation at attempts to deny them, and statute never contemplated disqualification for bias against wrongdoers acquired from evidence presented in the course of judicial proceedings before him); *Smith v. Danyo*, 441 F.Supp. 171, 180 (M.D.Pa.1977), *aff'd*, 585 F.2d 83 (3d Cir. 1978) (attitude judge may entertain toward subject matter of a case, here sentiment that personal injury suits do not belong in federal courts, does not disqualify him); *Denis v. Perfect Parts*, 142 F.Supp. 263 (D.Mass.1956) (statute not directed to judicial exposure to similar questions so judge who had previously determined validity of plaintiff's patent could hear infringement suit against new defendant). *Cf. United States v. Thompson*, 483 F.2d 527, 530 (3d Cir. 1973), *cert. denied*, 415 U.S. 911, 94 S.Ct. 1456, 39 L.Ed.2d 496 (1974) (Adams, J., *dissenting*) (bias against class "personal" when based on characteristic extraneous to judicial process, e. g., race, and "judicial" when based on trait defined by legal or judicial consideration such as violation of particular law).

Neither would the facts asserted in the affidavit convince a reasonable person of the bias which disqualifies a judicial officer. While Judge Hodges' remarks indicated his dissatisfaction with the nondeterrent effect of plea-bargained light sentences and his intention to impose stiffer penalties to curb large scale drug importation, his remarks were prefaced by an explicit commitment to the continued use of judicial discretion and

review of each case on a case-by-case basis. This aspect of Judge Hodges' statement distinguishes this case from the Third Circuit cases cited in support of defendants' position, *United States v. Thompson*, 483 F.2d 527 (3d Cir. 1973) and *United States v. Townsend*, 478 F.2d 1072 (3d Cir. 1973), in which the trial judge announced a practice of sentencing all selective service violators to at least two and a half years in prison no matter what "good people" they were. Nothing in Judge Hodges' statement reasonably suggests that in sentencing defendants he would fail to consider presentence reports or any defendant's statement on his own behalf or that he would not tailor sentences to the individual circumstances of each defendant. While our review is properly limited to assessment of the affidavit's sufficiency, we note that Judge Hodges used presentence reports and heard testimony in mitigation from all defendants, and a less than mandatory sentence as given each defendant.

### III. *Prosecutorial Comment on Defendants' Silence*

■ Defendants' final contention is that the Government committed reversible error by improperly commenting during trial on defendants' silence. Defendants challenge two instances of improper comment, neither of which compels reversal of their convictions.

In examining one of the Customs officers, the Government asked whether defendant Gutierrez, after being taken into custody, had ever told him of his whereabouts before boarding the BONNIE LASS. Defendant's objection was sustained, the question was never answered and defendant Gutierrez' post-arrest silence never elicited. The question could have been answered "yes" and "no," and, standing alone, it is not so suggestive as to constitute comment on defendant's silence. *Pineda v. State of Florida*, 564 F.2d 1163 (5th Cir. 1977), *cert. denied*, 436 U.S. 909, 98 S.Ct. 2245, 56 L.Ed.2d 409 (1978).

■ The Government in its final rebuttal argument, referring to a defense theory advanced during defendants' final arguments, questioned in the following manner defendants' failure to relate the same explanation to the Customs officers who stopped and boarded the BONNIE LASS:

> Why didn't they call the police? Why did they lie? Why did Raul Hernandez say, "No cargo—no cargo" when the Customs people got on the boat?—When it's everywhere?

> Why didn't he say "Thank God you're here. We've got all this pot. We hijacked this boat. I don't know who it belongs to. We just happened to be out in the dead of night in Apollo Beach, a residential area, flashing lights—these people brought us on a boat and they were flashing lights at us. And we didn't —you know, gee, we didn't know that the boat—I mean, obviously, we thought it was legal, because all the lights were out in the shrimper and they wanted us to see them so they turned all the lights out."

Defendants contend that prosecutorial use of their silence to impeach the exculpatory story offered at trial violated due process rights recognized in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Defendants cite as additional support three decisions in which this Court interpreted and applied *Doyle* to find reversible error in prosecutorial comment on defendants' silence. *United States v. Meneses-Davila*, 580 F.2d 888 (5th Cir. 1978); *Chapman v. United States*, 547 F.2d 1240 (5th Cir.), *cert. denied*, 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977); *United States v. Luna*, 539 F.2d 417 (5th Cir. 1976).

None of the case support adduced by defendants controls the question before us. In each of those cases, the prosecutor commented on a defendant's failure to exculpate himself after he had been arrested and given *Miranda* warnings. The *Doyle* opinion emphasizes the significance of *Miranda* warnings to the constitutional dimension of improper prosecutorial comment:

The warnings mandated by that case, . . . require that a person taken into custody be advised immediately that he has the right to remain silent, . . . Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested.

426 U.S. at 617, 96 S.Ct. at 2244. We are not dealing with ambiguous silence arguably inspired by *Miranda* warnings.

At the time of the boarding and general questioning, defendants were not subjected to coercive or custodial interrogation but only to those restrictions imposed by a routine Customs check. *See United States v. Warren*, 578 F.2d 1058, 1070 (5th Cir. 1978) (*en banc*); *United States v. Thompson*, 475 F.2d 1359, 1364 (5th Cir. 1973). *See generally* Annot., 31 A.L.R.3d 565, 657–662 (1970).

The explanation for defendants' presence on a boat filled with 50,000 pounds of marijuana was raised for the first time in defendants' closing arguments. In essence, defendants claimed to have boarded the boat at Apollo Beach as hired crew, ignorant of their intended mission. The captain of the vessel, a mysterious figure whose part in these events was never intimated in the course of the trial, went ashore to make arrangements for disposal of the illicit cargo. Meanwhile defendants discovered the marijuana and fled, hijacking the boat with the intention of dumping its cargo in the Gulf of Mexico.

The BONNIE LASS was pursued, the story goes, by several small boats commanded, perhaps, by the enraged captain, defendants suggest. The small boats circled and pulled in front of the BONNIE LASS, trying to intercept her. When the Customs boat arrived on the scene, the smaller boats disappeared. In closing arguments, defendants stressed the maneuvers of these small boats, repeatedly asking why the Customs

officers made no attempt to apprehend them since they carried the real culprits.

Defendants suggested their full cooperation with Customs when boarded, pointing out that no resistance had been offered, defendants had helped by adjusting the brooms and one defendant had even made coffee "for everyone's comfort."

The Government responded to this dramatic characterization of the defendants' predicament in rebuttal closing argument by pointing out its inconsistencies with the manner in which defendants actually received the Customs officers when they boarded. Rather than expressing relief at what would have been their rescue, defendants kept silent and denied having any cargo at all. The Government relates the omitted explanation which should have been given Customs with obvious sarcasm which suggests that the reason the story was not offered was its patent absurdity.

While we find defendants' case authority inapposite, this Court has considered the impeachment use of pre-arrest, pre-*Miranda* silence in *United States v. Henderson*, 565 F.2d 900 (5th Cir. 1978). The Court stated:

The silence of an accused who has not been given a *Miranda* warning cannot be used against him to impeach his credibility, unless his silence is inconsistent with his innocence and inconsistent with his exculpatory statement given at the trial. Otherwise, it lacks significant probative value and carries with it an intolerable prejudicial impact.

565 F.2d at 905.

Defendants' failure to explain their dilemma to Customs agents upon boarding and initial questioning is totally inconsistent with their tale of desperate flight and desire to rid themselves of the cargo. The situation is analogous to the scenario depicted in *United States v. Harp*, 536 F.2d 601 (5th Cir. 1976). In *Harp* the Court considered comment on the failure of pris-

oners apprehended in the middle of an apparent escape attempt to tell the warden the story offered at trial that one prisoner had kidnapped the other nine and forced them into the escape vehicle. The Court found reversible error since *Miranda* warnings had been issued before the failure to explain, but noted that absent *Doyle's* emphasis on *Miranda* warnings, the failure to promptly advise officials of their duress would have been highly probative of the recent fabrication of their exculpatory story.

We conclude that the prosecutor's comments were a permissible response to defendants' closing arguments.

AFFIRMED.