[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-12420

Non-Argument Calendar

_____

DONOVAN G. DAVIS, JR.,

Petitioner-Appellant,

*versus*

UNITED STATES OF AMERICA,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket Nos. 6:20-cv-01037-CEM-DCI,
6:14-cr-00043-CEM-DCI-2

_____

Before ROSENBAUM, BRANCH, and ANDERSON, Circuit Judges.

PER CURIAM:

Donovan G. Davis, Jr., a federal prisoner proceeding with counsel on appeal, appeals the district court's denial of his motion to vacate his sentence under 28 U.S.C. § 2255. A judge of this Court granted a certificate of appealability ("COA") on whether the district court erred in rejecting, without an evidentiary hearing, Davis's claims that (a) his trial counsel provided ineffective assistance by failing to assert a statute-of-limitations defense, (b) his non-appearing attorney's out-of-court participation in his underlying criminal proceedings created a conflict of interest, and (c) his counsel provided ineffective assistance by waiving his rights under *Kastigar v. United States*, 406 U.S. 441 (1972). A COA was also granted on whether the court erred in rejecting Davis's claim that the court lacked subject-matter jurisdiction over his prosecution. Finally, Davis challenges the district judge's refusal to recuse from the § 2255 proceeding.

## I. BACKGROUND

On February 26, 2014, a federal grand jury indicted Davis for participating in a conspiracy to defraud through Capital Blu Management, LLC, a company that traded in the off-exchange foreign currency or "forex" marketplace. According to the indictment, Davis and his Capital Blu partners, Blayne Davis ("Blayne") and Damien Bromfield ("Bromfield"), solicited and retained investors

with lies about Capital Blu's consistently positive rates of return, among other false information, at the same time Capital Blu was experiencing massive trading losses and the partners were diverting investor funds for personal use. The alleged conspiracy lasted from January 2008 through September 15, 2008, when Capital Blu was shut down. Bromfield (charged by separate indictment) and Blayne pled guilty and cooperated with the government. Davis pled not guilty and proceeded to trial.

Following a nine-day trial in May 2015, a jury found Davis guilty of one count of conspiracy to commit mail and wire fraud, six counts of wire fraud, one count of mail fraud, and eight counts of money laundering. At trial, Davis was represented by attorneys Andrew Chmelir and Jonathan Rose. Bromfield testified for the government, describing the formation of Capital Blu, Davis's role in the company, and the company's losses and misreporting.

The district court sentenced Davis to a total of 204 months of imprisonment. It then denied Davis's motion for a new trial asserting newly discovered evidence relating to Bromfield's alleged perjury at trial. On appeal, we affirmed Davis's convictions and sentence and the denial of his motions for a new trial. *See United States v. Davis (Davis I)*, 767 F. App'x 714 (11th Cir. 2019); *see also United States v. Davis (Davis II)*, 836 F. App'x 754 (11th Cir. 2020) (affirming the denial of a second motion for new trial).

### A. Davis's § 2255 Claims

In June 2020, Davis filed a *pro se* motion to vacate his sentence under 28 U.S.C. § 2255, raising numerous claims for relief. Four claims are relevant to this appeal.

First, in "Claim 1.1," Davis alleged that trial counsel provided ineffective assistance by failing to raise the five-year statute of limitations as a defense to the February 26, 2014, indictment, since the underlying conduct had concluded by September 2008.

Second, in "Claim 1.2," Davis alleged that trial counsel provided ineffective assistance by causing him to waive *Kastigar* protections granted by a prior proffer agreement. Davis explained that, in October 2008, he entered into a proffer agreement with the government to talk about Capital Blu, with the assurance that it would not make direct or derivative use of his statements. Although the U.S. Attorney's Office for the Middle District of Florida ("MDFLA Attorney's Office") declined to prosecute, Davis asserted, the U.S. Attorney's Office for the District of Columbia ("DC Attorney's Office") disagreed and "unburied the investigation." Davis ultimately spoke with the DC Attorney's Office in 2013 under a new proffer agreement, but trial counsel "overlooked or misunderstood" that, in doing so, Davis "would waive the earlier *Kastigar* protections," which gave the government "access to tens of thousands of documents that otherwise were too inextricably commingled to use in the prosecution."

Third, in "Claim 2.1," Davis alleged that Charles Greene, his "long-time attorney," also represented coconspirator Bromfield, and that Greene had a conflict of interest when he advised Davis to

go to trial because, according to Greene, Bromfield's testimony would not be harmful to Davis and may be helpful. Davis alleged that Greene "could not have advised [him] to enter a guilty plea because that would have extinguished his other client's opportunity to earn" a sentencing reduction by testifying against Davis. Davis submitted several affidavits from family members and a Capital Blu investor who said they heard Greene make similar assurances about Bromfield's testimony.

Finally, in "Ground Nine," Davis alleged that the government lacked subject-matter jurisdiction over his prosecution because, at the time the grand jury returned the indictment, the prosecuting attorneys—Assistant United States Attorneys Jonathan Hooks and Ephraim Wernick—"lacked legal authority to appear in the grand jury proceedings or to obtain an indictment on behalf of the United States."

## B. Recusal Issues

In addition to his § 2255 motion, Davis also filed *pro se* an application for Judge Mendoza's recusal under 28 U.S.C. § 144, supported by affidavits from Davis and Frank Amodeo, an inmate who had prepared filings for Davis in the past. Davis alleged that Judge Mendoza exhibited a bias towards "the younger generation" and those he perceived as undeserving of their wealth. Davis also maintained that Judge Mendoza had prejudged Davis's guilt before trial, citing the judge's comments at his coconspirators' sentencings.

The district court denied the motion, finding that Davis did not establish an extrajudicial source of bias or show there was

pervasive bias that prejudiced him, reasoning that Davis's allegations were based on the court's unfavorable rulings. Davis moved for reconsideration, arguing that the court incorrectly used the legal standards for 28 U.S.C. § 455, not § 144, and that the court had obtained and used information from an extrajudicial source when resolving a prior motion for new trial. The court denied the motion.

Later, after obtaining counsel, Davis filed a renewed motion for Judge Mendoza's recusal. In the motion, Davis explained that he had been interviewed by U.S. Marshals on December 18, 2020, about threatening emails Judge Mendoza had received and forwarded to the Marshals for investigation. For the Marshals to have interviewed him, according to Davis, "Judge Mendoza must have named Davis as a suspect," putting the judge's impartiality toward Davis reasonably in question.

The district court denied the recusal motion, finding that Davis had not "established any source of extrajudicial bias or shown that there was pervasive bias that prejudiced him." The court found that Davis's allegations were "legally insufficient to support a motion for disqualification" because he "provide[d] no evidence, aside from conjecture, that the undersigned directed the U.S. Marshal to investigate him regarding any e-mails. As such, Petitioner's allegations are legally insufficient to support a motion for disqualification." The court later denied Davis's motion to alter or amend, which sought an explicit statement from the court that it did not name Davis as a suspect.

### C. Briefing and Evidence on the § 2255 Motion

While no evidentiary hearing was held, the parties submitted various documentary evidence and affidavits as part of their briefing on Davis's § 2255 motion. The parties and the court also cited documents that were filed in Davis's underlying criminal case. We summarize the relevant filings and evidence below.

1. Government's response in opposition

After Davis filed his § 2255 motion, the government filed a response in opposition, asserting that most claims were procedurally defaulted and that the ineffective-assistance claims failed on the merits. In relevant part, the government asserted that the indictment was timely because Davis had executed two agreements with the government tolling the limitations period on December 26, 2012, and April 30, 2013.

In support, the government submitted copies of the two tolling agreements. Both agreements reported that Davis was "the subject of a grand jury investigation for potential criminal charges," including fraud and money laundering, in connection with his "alleged participation in soliciting investors and managing investment accounts on or about January 2007 through on or about September 2008." Because Davis "would like additional time for his counsel to confer with representatives of the government," the agreements reported, the parties agreed to "toll all possible statutes of limitations for all possible charges which could be charged by a grand jury." The parties further agreed that Davis could withdraw from the agreements by providing written notice of intent to withdraw

and receiving written confirmation of receipt from the government, and that any limitations period would begin running 30 days after notice of withdrawal.

The 2012 tolling agreement was signed by Davis, Davis's counsel (A. Brian Phillips), and AUSA Wernick. The 2013 tolling agreement was signed by Davis, Davis's counsel (Chmelir), and AUSA Wernick.

2. Davis's reply in support of the § 2255

In a counseled reply, Davis challenged the tolling agreements, arguing that he had withdrawn from the December 2012 agreement in February 2013, and that the April 2013 agreement was a forgery. He also contended that Greene's conflict adversely affected his trial counsel's performance, and that the government failed to address his *Kastigar* clam. He attached supporting evidence, including affidavits from himself, his wife, Bromfield, and an expert handwriting analyst and document examiner.

In a personal affidavit, Davis addressed the circumstances surrounding the 2012 tolling agreement. He explained that, in December 2012, his attorneys at the time—Greene and Phillips—said he was being investigated for failure to file personal tax returns. Based on those representations, Davis entered into a tolling agreement. But when Davis was eventually questioned on February 13, 2013, the government was focused solely on Capital Blu. Feeling misled, Davis directed Phillips to immediately withdraw from the agreement, and Phillips confirmed the withdrawal the next day. Davis then fired Phillips. Not long after, Greene advised Davis that

the government wanted another meeting to discuss Blayne and Bromfield, and Davis hired attorneys Chmelir and Rose on Greene's advice. After Davis fired Phillips, none of his attorneys (Greene, Chmelir, or Rose) "discuss[ed] plea negotiations with [him]." Davis averred that he did not enter "into a tolling agreement subsequent to [his] withdrawal from the December 2012 tolling agreement," and did not sign or authorize the tolling agreement dated April 30, 2013.

Davis's affidavit also covered post-indictment meetings with attorneys Greene and Chmelir. In these meetings, according to the affidavit, Greene insisted that Davis proceed to trial, assuring Davis that "Bromfield's testimony will not hurt [Davis] at trial." Greene told Davis that he represented and spoke regularly with Bromfield, who allegedly felt bad for getting Davis into a fraud. Then, according to the affidavit, "Chmelir told [Davis] that although he has never met or spoken to Bromfield, Bromfield's testimony will not hurt [Davis]." When Davis asked how Chmelir knew that, Chmelir replied that he had worked with Greene for years and "trust[ed] whatever Chuck [Greene] tells" him. Finally, the affidavit asserted that, after the first day of trial, Chmelir admitted to Davis that he was receiving advice from Greene on trial tactics and strategy.

Davis's wife, Christiane Davis, corroborated some of these details in a sworn declaration. Christiane said that, in February 2013, she overheard Davis direct Phillips to withdraw from the tolling agreement and cease cooperation with the government. The next day, Phillips confirmed that he had withdrawn Davis from all

agreements with the government.  Then, in November 2013, she heard Chmelir confirm that any agreements with the government "were done and cancelled since February."

William B. Smith, a certified handwriting analyst and certified questioned document examiner, swore that Davis's signature on the 2013 tolling agreement was "not genuine," and he attached a report that detailed his methodology and findings.

Finally, Bromfield's affidavit asserted that he was "represented and advised by" Greene in his criminal case and during the investigations surrounding Capital Blu.

3.  Government's sur-reply

The government filed a sur-reply with additional arguments and evidence.  Notably, as to the *Kastigar* claim, the government argued that it acted within the scope of the proffer agreements, which did not provide derivative-use immunity.  The government attached copies of a proffer agreement dated October 8, 2088, and a continuation letter from October 13, 2008.

The 2008 proffer agreement provided that, "In the event DONOVAN DAVIS is prosecuted, the government will not offer in evidence during its case-in-chief . . . any statements made and/or information provided by DONOVAN DAVIS at the proffer, except as noted below."  The government could use Davis's statements in a prosecution for providing false information or as impeachment evidence.  Moreover, the proffer continued,

> The government may use any information or evidence (other than the statements of DONOVAN DAVIS) derived directly or indirectly from the proffer during any prosecution of DONOVAN DAVIS, including during bail/detention proceedings, during its case-in-chief, or in aggravation of DONOVAN DAVIS's sentence. The government is completely free to pursue any and all investigative leads derived in any way from the proffer, and this could lead to the acquisition of evidence admissible against DONOVAN DAVIS.

The proffer agreement, in short, provided immunity from direct use of Davis's statements, except in narrow circumstances, but it expressly permitted the government to make derivative use of those statements. A follow-up letter dated October 13, 2008, reflected that Davis was interviewed by government agents on October 9, 2008, that the agreement applied to all statements made in that interview, and that the proffer would continue the next day.

The government also addressed Davis's claim that the government lacked the legal authority to bring the prosecution. The government attached a notice dated September 11, 2012, in which David Margolis, Associate Deputy Attorney General, approved the recusal of the MDFLA Attorney's Office from Davis's investigation and potential prosecution. Margolis assigned the matter to the DC Attorney's Office pursuant to 28 U.S.C. § 515(a), and directed and authorized United States Attorney Ronald C. Machen, Jr., to

"conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings . . . which the United States Attorney for the Middle District of Florida is authorized by law to conduct regarding this matter." The notice also specified that "[a]ll Assistant United States Attorneys subsequently assigned to this matter must be appointed a[s] Special Attorneys" to "appear on behalf of the government in the Middle District of Florida." Thus, according to the government, "the case was prosecuted by [AUSAs] operating as Special Attorneys under the authority of 28 U.S.C. § 515(a)."

4.  Records from the criminal docket

Documents filed in the underlying criminal case reflect that, after the DC Attorney's Office was assigned to the case, Davis executed two proffer agreements on February 13, 2013, and May 17, 2013. The February 2013 agreement was signed by Davis, Davis's counsel (Phillips), and AUSA Wernick. The May 2013 agreement was signed by Davis, Davis's counsel (Chmelir), and AUSA Wernick.

Like the prior 2008 proffer agreement, the 2013 proffer agreements both provided that the government could not use statements made or information provided by Davis, except in limited circumstances. Similar to the 2008 agreement, the 2013 agreements also permitted the government to "make derivative use of and . . . pursue any investigative leads suggested by any statements made by, or other information provided by, your client." In contrast to the 2008 agreement, however, the 2013 agreements contained an explicit statement that *Kastigar* protections did not apply:

Because any statements made during this debriefing are voluntarily made on the part of your client, rather than compelled, *Kastigar* protections do not apply. Accordingly, your client understands that based on the terms of the agreement there will be no *Kastigar* hearing at which the government would have to prove that the evidence it would introduce at trial is not tainted by any statements made by or other information provided by your client.

### D. District Court's Denial

The district court denied Davis's § 2255 motion in May 2023, without an evidentiary hearing, as requested by Davis. The court found, in relevant part, as follows.

First, the district court rejected Claim 1.1, dealing with alleged ineffectiveness in failing to interpose the statute of limitations as a defense. Initially, the court found that Davis's arguments regarding withdrawal from and forgery in the tolling agreements were "deemed waived" because he raised them for the first time in his reply brief. But the court decided to "address the merits of this issue" anyway.

The district court concluded that Davis failed to "produce evidence" that he complied with the terms of withdrawal in the tolling agreement. And it found that the 2012 tolling agreement itself refuted Davis's alleged belief that the February 2013 interview was about tax issues. Moreover, the court continued, even assuming Davis withdrew from the 2012 tolling agreement and did not

sign the 2013 tolling agreement, Davis "would have been aware of the alleged expiration of the statute of limitations," but never raised the issue. The court noted that Davis signed speedy-trial waivers in April 2014 and September 2015. Finally, the court reasoned that,

> given the [two tolling agreements], there was no basis upon which counsel could have argued that the statute of limitations had expired." Even if the Reaffirmation Tolling Agreement was a forgery, (1) there is no allegation that Petitioner's counsel was aware of the forgery or that Petitioner ever told him about the forgery, and (2) the Initial Tolling Agreement still was in effect, as Petitioner has not shown otherwise.

Second, the district court found that Davis could not establish a claim of ineffective assistance in relation to the 2013 proffer agreements. The court reasoned that, because the 2008 and 2013 proffer agreements were "substantively the same, his counsel cannot be deemed to have performed deficiently by advising him to continue his proffers" in 2013. The court rejected Davis's argument that the government must have relied on his statements when it used the term, "Big Boys Club," at trial, noting that "testimony about the Big Boys Clubs was produced on Chmelir's cross-examination of Damien Bromfield, who attributed the term to Blayne Davis." Accordingly, the court found that Davis had "failed to establish that his counsel was deficient or that he sustained prejudice" with respect to Claim 1.2.

Third, the district court concluded that Davis had failed to establish that his attorneys operated under a conflict of interest. In the court's view, the record did not reflect that Greene appeared on behalf of Davis in the underlying criminal proceeding, or that "Greene represented Bromfield in his criminal case."

Finally, the district court determined that Davis was procedurally barred from raising several claims because they were not raised on direct appeal, including Ground Nine, which alleged challenged the special prosecutors' legal authority to initiate a prosecution against him. The court also concluded that Davis could not satisfy any exceptions to the procedural bar.

### E. COA Order

The district court denied a COA for Davis to appeal the denial of his § 2255 motion. A judge of this Court granted a COA on the following issues:

> (1) Whether the district court erred in rejecting, without holding an evidentiary hearing, Davis's claim, that his trial counsel performed ineffectively for failing to argue that the statute of limitations had expired on the charged crimes?

> (2) Whether the district court erred in rejecting, without holding an evidentiary hearing, Davis's claim, that his non-appearing defense attorney's out-of-court participation in his underlying criminal proceedings resulted in a conflict of interest?

(3) Whether the district court erred in concluding that Davis was procedurally barred from raising the claim that the district court lacked subject-matter jurisdiction over his prosecution?

(4) Whether the district court erred in rejecting Davis's claim, that counsel provided ineffective assistance for advising him to waive his rights under *Kastigar v. United States*, 406 U.S. 441 (1972), without holding an evidentiary hearing?

## II.  STANDARD OF REVIEW

In adjudicating a district court's denial of a § 2255 motion, we review findings of fact for clear error and questions of law *de novo*. *LeCroy v. United States*, 739 F.3d 1297, 1312 (11th Cir. 2014). We review a district court's denial of a claim of ineffective assistance of counsel *de novo*. *Ochoa v. United States*, 45 F.4th 1293, 1298 (11th Cir. 2022). We review the "denial of an evidentiary hearing" in a § 2255 proceeding for an abuse of discretion. *Id.* The abuse-of-discretion standard is deferential, and, in applying it, we may affirm the district court, even when we would have reached a different conclusion in the first instance. *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015).

We review *de novo* issues of law, including the interpretation of an immunity agreement. *United States v. Hill*, 643 F.3d 807, 874 (11th Cir. 2011). We generally may affirm for any reason supported by the record, even if not relied upon by the district court. *LeCroy*, 739 F.3d at 1312.

### III.  INEFFECTIVE-ASSISTANCE CLAIMS

Three of the four issues listed in the COA order concern the district court's decision not to hold an evidentiary hearing before resolving the merits of the respective ineffective-assistance claim.

A district court must hold an evidentiary hearing on a § 2255 motion "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b); *Anderson v. United States*, 948 F.2d 704, 706 (11th Cir. 1991).  Thus, if a movant "alleges facts that, if true, would entitle him to relief, then the district court should order an evidentiary hearing." *Aron v. United States*, 291 F.3d 708, 714–15 (11th Cir. 2002) (quotation marks omitted).  Such a hearing is not required when a movant's claims are "patently frivolous" or "affirmatively contradicted by the record."  *Id.* at 715.  But generally speaking, "contested fact issues in § 2255 cases must be decided on the basis of an evidentiary hearing, not affidavits."  *Montgomery v. United States*, 469 F.2d 148, 150 (5th Cir. 1972).[1]

To prevail on an ineffective-assistance-of-counsel claim, a defendant must satisfy the two-part test established in *Strickland v. Washington* that (1) his attorney's performance was deficient and (2) the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  An attorney's performance is measured under an

---

[1] This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

objective standard of reasonableness, and there is a strong presumption that the attorney's conduct fell within the range of reasonable performance. *Id.* at 688, 690. Deficient performance "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Prejudice occurs when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

### A.  Statute of Limitations

The crimes charged in the indictment were subject to a five-year statute of limitations. *See* 18 U.S.C. § 3282(a); *United States v. Webster*, 127 F.4th 318, 322 (11th Cir. 2025). Thus, to be timely, the "indictment had to be returned within five years" of the offense or the "last alleged overt act" of the conspiracy. *United States v. Farias*, 836 F.3d 1315, 1324 (11th Cir. 2016).

The indictment against Davis alleged a conspiracy—which formed the basis for all the charges—that ended no later than September 15, 2008. So ordinarily, the indictment needed to have been returned by September 15, 2013, to be timely. The indictment here was returned on February 26, 2014.

It's undisputed that Davis executed an agreement tolling the applicable limitations period on December 26, 2012. That agreement was in effect at least through February 13, 2013, when Davis sat for an interview with the government. Immediately after the interview, Davis averred, he asked counsel (Phillips) to withdraw

from the agreement, and, the next day, counsel "confirmed that he did." Davis's wife Christiane corroborated these details in a sworn declaration.

The government offered evidence that Davis executed another tolling agreement on April 30, 2013. But Davis flatly denied signing any further agreement, and he offered expert testimony that his signature on the 2013 tolling agreement was not genuine. Christiane also asserted that, in November 2013, she heard counsel (Chmelir) confirm that any agreements with the government "were done and cancelled since February."

We conclude that the district court erred in denying this claim without an evidentiary hearing. As an initial matter, we disagree with the court's view that Davis improperly raised "claims for the first time in the reply" in support of his § 2255 motion. Rather, the government raised the tolling agreements as a defense in its response, and Davis's reply simply rebutted the government's arguments about the agreements with supporting evidence. No new claims were raised, even if additional facts were revealed.

As to the merits of the issue, Davis only needed to "*allege*— not prove—reasonably specific, non-conclusory facts that, if true, would entitle him to relief." *Winthrop-Redin v. United States*, 767 F.3d 1210, 1216 (11th Cir. 2014) (quotation marks omitted). He met that standard. Accepting Davis's alleged facts and evidence as true, the initial tolling agreement was in effect from December 26, 2012, through mid-March 2013, or 30 days after Davis notified the government of his intent to withdraw in February 2013, and Davis

neither signed nor authorized any other tolling agreements. Under that version of the facts, the indictment would not be timely, and Davis arguably could establish prejudice from the failure to raise a statute-of-limitations defense.

Although the initial agreement stated that Davis could withdraw only by providing the government with written notice of his intention to withdraw, and receiving written confirmation of receipt from the government, Davis's allegations establish that he believed that counsel properly withdrew him from the agreement. Nothing in the record refutes that claim. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").

The government asserts that the district court was entitled to use "common sense" to reject Davis's "belated narrative about withdrawing from the initial tolling agreement," citing our decision in *Winthrop-Redin*, 767 F.3d at 1217. In *Winthrop-Redin*, however, the movant's "newly-minted story about being threatened . . . [was] supported only by the defendant's conclusory statements." *Id.* ("The fact that Winthrop-Redin presented only his own affidavit bears on whether the record conclusively shows he is entitled to no relief."). Davis's story, in contrast, was supported by more than just his own affidavit. So even assuming there are good reasons to question the veracity of Davis's claims regarding the tolling agreements, we cannot say that they are refuted by the record.

The district court further reasoned that, even assuming the 2013 tolling agreement was a forgery, there was no indication Chmelir knew of the forgery, so he could not have been ineffective for assuming the limitations period had been tolled. The government notes that Chmelir referenced Davis's "cooperation in agreeing to toll the statute of limitations" in an October 2014 motion to continue the criminal trial, as well as Davis's lack of personal objection to the timeliness of the case. The record lacks any testimony from Chmelir about these matters, however. And Davis's wife Christiane asserted that, in November 2013, she heard Chmelir confirm to Davis that any agreements with the government "were done and cancelled since February." Thus, the current record reflects contested factual issues about the circumstances of the tolling agreements and the state of Chmelir's knowledge. *See Montgomery*, 469 F.2d at 150.

Because the record of the case does not refute Davis's assertions concerning the 2012 and 2013 tolling agreements, the district court should have held an evidentiary hearing before denying this claim. We vacate and remand for further proceedings.

### B. Conflict of Interest

The right to effective assistance of counsel includes "the right to counsel who is unimpaired by conflicting loyalties." *Duncan v. Alabama*, 881 F.2d 1013, 1016 (11th Cir. 1989); *see* U.S. Const. amend. VI. A defendant claiming ineffective assistance due to a conflict of interest must establish an "actual conflict," which is a "conflict [that] adversely affected [his] counsel's performance," not

"a mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 171 (2002). "[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980).

A conflict may arise from an attorney's simultaneous or successive representation of adverse interests. *McConico v. Alabama*, 919 F.2d 1543, 1546 (11th Cir. 1990). Neither is conclusive in determining the existence of an actual conflict, but it is "easier to prove actual conflict arising from simultaneous representation than from successive representation." *Id.* The movant must show "inconsistent interests and must demonstrate that the attorney made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other." *Id.* (quotation marks omitted). The inquiry into the existence of an actual conflict is "fact-specific." *Freund v. Butterworth*, 165 F.3d 839, 859 (11th Cir. 1999).

We have recognized that an attorney's conflict "does not necessarily violate the Sixth Amendment if the defendant also receives the assistance of conflict-free counsel." *Ochoa*, 45 F.4th at 1299. The Sixth Amendment "ensures the right to effective assistance of *an* attorney[,] . . . but does not include the right to receive good advice from every lawyer a criminal defendant consults about his case." *Id.* (quotation marks omitted). So when "[o]ther attorneys represented [the defendant] during and after [counsel] represented him, . . . it is not enough to allege that [counsel] alone

operated under a conflict of interest." *Id.* Rather, the defendant must sufficiently allege "that the conflict adversely affected his representation," which means establishing that "his attorney's conflict denied him the opportunity to pursue a plausible alternative defense strategy or tactic." *Id.* (quotation marks omitted). He need not show the alternative strategy would have been successful, only that it was a "viable alternative." *Id.* (quotation marks omitted).

Here, the district court erred in denying Davis's conflict-of-interest claim without an evidentiary hearing. Davis's allegations, accepted as true, reflect that Greene advised both Davis and Chmelir in relation to the criminal case, even if Greene did not enter a notice of appearance. According to Davis's affidavit, Greene insisted that Davis proceed to trial, assuring Davis and Chmelir that "Bromfield's testimony will not hurt [Davis] at trial," and then advised Chmelir on trial strategy. At the same time, Davis alleges, Greene was representing Bromfield, a coconspirator who was testifying against Davis for the government and hoping to earn a sentence reduction for his cooperation. Assuming Davis's alleged facts are true, *see Winthrop-Redin*, 767 F.3d at 1215, he may be able to prove that Greene had an actual conflict because he "represented adverse clients simultaneously," *McConico*, 919 F.2d at 1548.

Of course, Davis also must show "that the conflict adversely affected his representation," which means establishing that "his attorney's conflict denied him the opportunity to pursue a plausible alternative defense strategy or tactic." *Ochoa*, 45 F.4th at 1299 (quotation marks omitted). He has not done so with respect to his

attorneys' trial performance, other than a vague suggestion that his trial attorneys "would have likely altered their strategy." That's not enough to show that any conflict had an adverse effect on Davis's trial representation. *See id.*

Still, Davis also claims that, due to Greene's conflict and his substantial influence on Davis's trial attorneys, none of his attorneys discussed the possibility of plea negotiations. *Cf. Stoia v. United States*, 22 F.3d 766, 768–69 (7th Cir. 1994) ("If a non-appearing attorney is burdened by a conflict of interest, the conflict may, nonetheless, adversely impact the defendant's trial because of that attorney's ability to influence how the defendant's trial attorney conducts the case."). Davis's § 2255 motion alleged that Greene "could not have advised [him] to enter a guilty plea because that would have extinguished his other client's opportunity to earn" a sentencing reduction by testifying against Davis.

It's not apparent from the record that pursuing a plea deal was not a "viable alternative" to going to trial. *Ochoa*, 45 F.4th at 1299. Nor does the record show what Davis may have discussed with his attorneys in relation to a potential guilty plea. And Greene's out-of-court participation and influence over Davis's trial counsel involves facts and events "outside the courtroom and upon which the record could, therefore, cast no real light." *Machibroda v. United States*, 368 U.S. 487, 494–95 (1962).

The government, citing *Ochoa*, argues that, even assuming Chmelir was affected by Greene's alleged conflict, Davis still had effective representation because he did not assert that Rose had a

conflict of interest. *See Ochoa*, 45 F.4th at 1299 ("[A]n attorney's conflict does not necessarily violate the Sixth Amendment if the defendant also receives the assistance of conflict-free counsel."). The record is unclear about Rose's role, however. He first made an appearance in the criminal case in February 2015, less than three months before trial. If Rose was retained solely to assist Chmelir at trial, we cannot say his representation contradicts Davis's claim that Greene's conflict and influence denied him the opportunity to pursue a potential guilty plea.

For these reasons, we conclude that an evidentiary hearing was necessary to resolve Davis's conflict of interest claim.

### C. *Kastigar* Waiver

In *Kastigar*, the Supreme Court held that, consistent with the Fifth Amendment right against self-incrimination, the government may compel a defendant to testify if it accords him "immunity from the use of [that] testimony, as well as evidence derived directly and indirectly therefrom." *Kastigar*, 406 U.S. at 453; *see U.S. v. Harvey*, 869 F.2d 1439, 1444–45 (11th Cir. 1989) (*en banc*). Thus, "[u]se and derivative-use immunity establishes the critical threshold to overcome an individual's invocation of the Fifth Amendment privilege against self-incrimination." *In re Grand Jury Subpoena Duces Tecum Dated March 25, 2011*, 670 F.3d 1335, 1351 (11th Cir. 2012).

When a defendant demonstrates that he testified under a grant of such immunity (both direct use and derivative use), the burden shifts to the prosecution, which then has "the affirmative duty to prove that the evidence it proposes to use is derived from

a legitimate source wholly independent" of the immunized testimony. *Kastigar*, 406 U.S. at 460; *Harvey*, 869 F.2d at 1444–45.

Because Davis's claim is based on a proffer agreement, "we must look to and, if necessary, interpret the text of the agreement" in order "to determine the scope of his immunity." *United States v. Hill*, 643 F.3d 807, 875 (11th Cir. 2011). "The construction of proffer agreements, like plea agreements, is governed generally by the principles of contract law, as we have adapted it for the purposes of criminal law." *United States v. Pielago*, 135 F.3d 703, 709 (11th Cir. 1998); *see also United States v. Blanco*, 102 F.4th 1153, 1163 (11th Cir. 2024).

Here, the record refutes Davis's claim that the 2008 proffer agreement provided him with "*Kastigar* protections." To be sure, the agreement immunized Davis's statements at the proffer, except in certain circumstances. But it otherwise made clear that the government was free to "use any information or evidence (other than the statements of DONOVAN DAVIS) derived directly or indirectly from the proffer during any prosecution of DONOVAN DAVIS," including "during its case-in-chief." In other words, the agreement clearly did not provide derivative use immunity. Because the government was expressly allowed under the agreement to make derivative use of Davis's statements, it follows that the government did not need to show, as in *Kastigar*, that "the evidence it propose[d] to use [was] derived from a legitimate source wholly

23-12420                    Opinion of the Court                    27

independent" of the immunized testimony.[2] *Kastigar*, 406 U.S. at 460; *Harvey*, 869 F.2d at 1444–45.

Because no "*Kastigar* rights" were afforded by the 2008 agreement, Davis did not surrender any previously granted protections when he executed the 2013 proffer agreement. The 2013 proffer agreements did not purport to waive Davis's prior direct-use immunity. Rather, like the 2008 agreement, the 2013 agreements provided for direct-use immunity, but not derivative-use immunity. Accordingly, counsel could not have been ineffective for failure to consider or advise Davis about *Kastigar*. No evidentiary hearing was necessary to resolve this claim.

Moreover, Davis's lone example of a violation confuses the nature of his claim. He says that his use of the term "Big Boys Club" was protected by the 2008 proffer agreement and then subsequently used by the government in its opening statement at his trial. That claim, however, appears to assert a violation of the 2008 proffer agreement's direct-use immunity—that is, the government's promise not to "offer in evidence during its case-in-chief . .

---

[2] The circuits to address the issue unanimously agree that *Kastigar* is not implicated when a proffer agreement expressly allows the government to make derivative use of immunized testimony. *See United States v. Hemphill*, 514 F.3d 1350, 1355–56 (D.C. Cir. 2008); *United States v. Smith*, 452 F.3d 323, 337 (4th Cir. 2006); *United States v. Catano*, 65 F.3d 219, 226 (1st Cir. 1995); *see also United States v. Harper*, 643 F.3d 135, 140 n.1 (5th Cir. 2011) ("When a defendant voluntarily provides information to the Government, however, the Fifth Amendment is not implicated, and the Government may negotiate a lesser degree of immunity.").

. any statements made and/or information provided by DONOVAN DAVIS at the proffer."[3]  But, again, the 2013 agreement did not purport to waive immunity for those statements, and derivative-use immunity is not in play, as we've just explained.  Accordingly, the court properly rejected this claim without an evidentiary hearing.

## IV.  PROSECUTORS' AUTHORITY

Subject-matter jurisdiction "defines the court's authority to hear a given type of case."  *United States v. Grimon*, 923 F.3d 1302, 1305 (11th Cir. 2019) (quotation marks omitted).  District courts have jurisdiction to hear cases involving "offenses against the laws of the United States."  18 U.S.C. § 3231.  An indictment invokes the district court's subject-matter jurisdiction so long as it "charges the defendant with violating a valid federal statute as enacted in the United States Code" and thus "alleges an offense against the laws of the United States."  *Grimon*, 923 F.3d at 1305 (quotation marks omitted).

Issues related to the appointment of prosecuting attorneys, however, generally "do[] not affect the Government's power to prosecute," and thus do not "deprive the district court of jurisdiction."  *United States v. Suescun*, 237 F.3d 1284, 1287 (11th Cir. 2001).  In *Suescun*, for example, we held that, even assuming an AUSA's

---

[3] To the extent Davis attempted to raise an ineffective-assistance claim based on a failure to raise a violation of the 2008 proffer agreement, he has made no showing of prejudice with respect to the brief use of the term "Big Boys Club" in a nine-day trial.

appointment "as temporary United States Attorney was invalid" under the Appointments Clause, "the appointment did not deprive the district court of jurisdiction to entertain the case and to adjudicate Suescun guilty of the charged offenses." *Id.* at 1287–88. Thus, we concluded that "Suescun waived his objection to the validity of the indictment because he did not present it as required by Rule 12(b), and the jurisdictional exception does not apply." *Id.* at 1288. In contrast, "challenges to subject matter jurisdiction cannot be waived." *United States v. Thompson*, 702 F.3d 604, 606 (11th Cir. 2012).

The indictment in this case stated that it was returned by special attorneys acting under authority conferred by 28 U.S.C. § 515. Section § 515 provides that "any attorney specially appointed by the Attorney General under law, may, when specifically directed by the Attorney General, conduct any kind of legal proceeding . . . including grand jury proceedings . . . whether or not he is a resident of the district in which the proceeding is brought." 28 U.S.C. § 515(a).

Here, the district court did not err in denying Davis's challenge to the indictment and prosecution as procedurally barred. Davis alleged that the AUSAs "lacked legal authority to appear in the grand jury proceedings or to obtain an indictment," and did not have the "specific authority to prosecute on actions in the Middle District of Florida." Like in *Suescan*, however, Davis's claim appears to concern the authority of the prosecuting attorneys, which does not "affect the [g]overnment's power to prosecute" or

"deprive the district court of jurisdiction." *Suescun*, 237 F.3d at 1287. Thus, the district court properly treated Davis's argument in substance as non-jurisdictional, even if Davis placed a jurisdictional label on it. *Cf. Gonzalez v. Crosby*, 545 U.S. 524, 528 (2005) (looking to the "substance" of a filing, not its form, to determine whether it was cognizable). Accordingly, "[Davis] waived his objection to the validity of the indictment because he did not present it as required by Rule 12(b), and the jurisdictional exception does not apply." *Suescun*, 237 F.3d at 1288.

Further, Davis's argument that "one cannot discern whether the out-of-district prosecutors were properly authorized or supervised by the appropriate authorities of government" at his trial based on the record before the district court fails. The government offered unrebutted evidence of a September 2012 notice assigning the matter to the DC Attorney's Office pursuant to 28 U.S.C. § 515(a), and authorizing that office to conduct any "kind of legal proceeding, civil or criminal, including grand jury proceedings," through AUSAs assigned as special attorneys. Beyond vague claims of an insufficient record, Davis does not explain what was deficient about this notice, nor does he develop his supervision argument with any specificity.

## V. RECUSAL OF THE DISTRICT JUDGE

Finally, we consider Davis's demand for recusal of U.S. District Judge Mendoza. We review a district judge's decision not to

recuse himself for an abuse of discretion.[4]  *United States v. Berger*, 375 F.3d 1223, 1227 (11th Cir. 2004).  "[W]e will affirm a district judge's refusal to recuse himself unless we conclude that the impropriety is clear and one which would be recognized by all objective, reasonable persons."  *United States v. Bailey*, 175 F.3d 966, 968 (11th Cir. 1999).

A district judge shall proceed no further when a party makes and files a timely and sufficient affidavit that the judge has a personal bias or prejudice for or against any party.  28 U.S.C. § 144. The affidavit must state the facts and the reasons for the belief that bias or prejudice exists.  *Id.*  An affidavit under § 144 must be "strictly scrutinized for form, timeliness, and sufficiency."  *United*

---

[4] We reject the government's argument that a COA is required to consider this issue.  Ordinarily, unless "a circuit judge or judge" issues a COA, "an appeal may not be taken to the court of appeals from . . . the final order in a proceeding under section 2255."  28 U.S.C. § 2253(c)(1)(B).  The COA requirement "governs final orders that dispose of the merits of" a proceeding under § 2254 or § 2255.  *Harbison v. Bell*, 556 U.S. 180, 183 (2009) (holding that an order relating to appointed counsel is "not such an order and is therefore not subject to the COA requirement"); *see* 28 U.S.C. § 2253(c)(1).  Davis's motion for recusal asserted the district judge's bias or prejudice in the § 2255 proceeding, and if legally sufficient, the judge would have been required to "proceed no further" in the case.  *See* 28 U.S.C. § 144.  Thus, the court's recusal ruling was collateral to the merits of the § 2255 proceeding, even if Davis was required to await final judgment to appeal it.  *See Harbison*, 556 U.S. at 183.  Accordingly, we conclude that no COA was necessary to appeal the denial of Davis's application for recusal under § 144.  *See, e.g.*, *Trevino v. Johnson*, 168 F.3d 173, 177–78 (5th Cir. 1999) (holding that no COA is required to appeal the denial of a recusal motion in a 28 U.S.C. § 2254 proceeding).

*States v. Perkins*, 787 F.3d 1329, 1343 (11th Cir. 2015) (quotation marks omitted).

A party seeking recusal under § 144 must allege facts that would convince a reasonable person that bias actually exists. *Christo v. Padgett*, 223 F.3d 1324, 1333 (11th Cir. 2000). The alleged bias or prejudice under § 144 must stem from an extrajudicial source. *Liteky v. United States*, 510 U.S. 540, 544 (1994). The exception to the general rule requiring an extrajudicial source is pervasive bias, which supports disqualification if the court's predisposition is "so extreme as to display clear inability to render fair judgment." *Id.* at 551. Neither a trial judge's comments on lack of evidence, nor adverse rulings, constitute pervasive bias. *Hamm v. Members of Bd. of Regents of State of Fla.*, 708 F.2d 647, 651 (11th Cir. 1983). Judicial remarks "that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge," but may support a bias challenge if "they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky*, 510 U.S. at 555 (emphasis omitted).

Here, the district judge did not abuse his discretion by denying Davis's application for recusal under § 144. At the outset, we note that Davis has not addressed his counseled motion for recusal based on the U.S. Marshal's investigation into emails sent to Judge Mendoza, so any appeal of that issue has been abandoned. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680–81 (11th Cir.

2014) (issues not briefed on appeal are deemed abandoned). Thus, this appeal relates solely to the original *pro se* application for Judge Mendoza's recusal under 28 U.S.C. § 144.

Davis's affidavit did not present legally sufficient grounds for recusal under § 144. Davis's affidavit identified approximately four grounds for the judge's recusal: (1) comments about the circumstances surrounding the preparation of Davis's Rule 33 motions, and another inmate's involvement in those motions; (2) "generational" bias; and (3) prejudgment of Davis's guilt.

The district court properly rejected the first ground as inconsistent with our decision in *Davis I*, which considered and rejected essentially the same allegations as grounds for recusal, and is law of the case here. *See Davis I*, 767 F. App'x at 734–35; *Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1288 (11th Cir. 2000) (explaining that the law-of-the-case doctrine bars relitigation of issues that were decided either explicitly or by necessary implication in a prior appeal).

As for the other grounds, they were not based on extrajudicial sources. Rather, Davis relied on remarks made by Judge Mendoza when sentencing his coconspirators, Blayne and Bromfield.[5]

---

[5] At Blayne's sentencing in October 2014, before Davis's trial, Judge Mendoza made the following comments when explaining his sentencing decision:

> I do think you stole this money. I think that the fact that you and your co-defendants were paying each other or paying yourselves $15,000 a month and having as much as $50,000 in monthly expenses while generating no income from this

But "opinions held by judges as a result of what they learned in earlier proceedings do not constitute bias or prejudice." *United States v. Amedeo*, 487 F.3d 823, 829 (11th Cir. 2007) (quotation marks omitted). These comments fail to show that "the bias is personal, as opposed to judicial, in nature." *United States v. Serrano*, 607 F.2d 1145, 1150 (5th Cir. 1979) (finding no extrajudicial source where the judge's comments "in context clearly demonstrate[] that any predisposition to sentence volume drug offenders severely stemmed from his observations in a strictly judicial capacity").

Nor do the judge's comments at his coconspirators' sentencings reveal "such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky*, 510 U.S. at 555. The comments Davis specified in his affidavit exclusively refer to judicial remarks that illustrate Judge Mendoza's reasoning on rulings adverse to Davis, Bromfield, and Blayne, which do not constitute pervasive bias. *Hamm*, 708 F.2d at 651. And we cannot say that the judge's comments reveal facts that would "convince a reasonable

---

business tells me that although you might have had the best intentions when you started this process, at some point you made a deliberate decision with your co-defendants that you were going to defraud these people.

Then, at Bromfield's sentencing in September 2015, after Davis's trial, the judge commented that "it's bad enough that all of you, as may be typical in your generation, believe that life is about getting on an elevator and going to the top floor immediately without any work in between. That seems to be normal now among the younger generation."

person" of the existence of disqualifying personal bias. *See Serrano*, 607 F.2d at 1150. We therefore affirm the denial of recusal.

## VI. CONCLUSION

In sum, we conclude that the district court should have held an evidentiary hearing before rejecting Davis's § 2255 claims of ineffective assistance based on the statute of limitations and non-participating counsel's alleged conflict of interest. We affirm the judgment in all other respects.

**VACATED AND REMANDED in part; AFFIRMED in part.**